Maxwell *v.* Schaefer, Appellant.

14

Argued January 11, 1955.    Before STERN, C. J.,
STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Herbert S. Levy*, with him *Appel, Ranck, Levy & Appel*, for appellant.

*Bernard J. Myers, Jr.*, for appellee.

OPINION BY MR. JUSTICE JONES, March 14, 1955:

Schaefer and Halpern, the named defendants, of Lancaster, Pennsylvania, were engaged in the manufacture of a quick-drying enamel paint capable of being sprayed on surfaces with a unit sprayer in the paint container. The product was marketed under the trade name "Spritzit" which, in Pennsylvania Dutch, means "spray it". Being desirous of securing a wider market

for their manufactures, Schaefer and Halpern entered into a written agreement with Maxwell, the plaintiff, on November 1, 1950, which gave him the exclusive right to the commercial distribution of "Spritzit". The agreement provided, inter alia, that the manufacturers would supply Maxwell with their product on a cost-plus basis; that he would have the exclusive right to control the sale of "Spritzit" throughout the world; that he would have the right to examine the manufacturers' books of account from time to time to check costs; that, except for certain limited sales to a named corporation in New York, the manufacturers would make no sales to third persons without Maxwell's consent; and that, during the term of the agreement, Maxwell would not engage in the distribution of any product similar to "Spritzit". The writing further provided that "The term of this Agreement is indefinite, but either Party may terminate it by giving to the other writen notice of the termination . . . , and the contract shall thereafter terminate one year from the date of delivery of the aforesaid notice."

Maxwell proceeded to act in accordance with the distribution agreement but, on April 11, 1951, the manufacturers notified him of their intention to terminate the agreement. On May 20, 1952, Maxwell instituted the present suit in equity to restrain the manufacturers from selling or distributing "Spritzit" to any person other than himself and to compel an accounting of allegedly improper sales already made. After preliminary objections by the defendants, challenging the legality of the agreement, had been overruled, the defendants answered over and the suit came on for hearing. While the hearing was in progress, the suit was discontinued as to Halpern who had dissociated himself from the venture some time after the execution of the distribution agreement. Maxwell conceded that he

16

was not entitled to injunctive relief inasmuch as the agreement had already been effectively terminated by Schaefer pursuant to the notice served as the contract permitted.

Following the hearing, the chancellor found the facts to be substantially as above recited and further concluded that Schaefer had breached the distribution contract by not supplying Maxwell with the entire output of "Spritzit" during the year from April 11, 1951, to April 11, 1952; that Schaefer had sold to others approximately 5,000 cases of "Spritzit" in violation of the distribution agreement; that Maxwell, who had realized a profit of $2.64 per case of "Spritzit" sold through him, suffered damages in the amount of $13,200; and that, by reason of his expenditure of certain moneys for promotional purposes, Maxwell had sustained an additional loss in the amount of $7,500. The chancellor accordingly entered a decree *nisi* awarding Maxwell damages in the aggregate sum of $20,700. The court en banc dismissed exceptions to the chancellor's adjudication, findings and conclusions and entered the final decree from which Schaefer took this appeal.

The appellant contends that (1) the exclusive distribution agreement was illegal as an unreasonable restraint of trade, (2) the evidence disclosed a consensual abandonment of the agreement by the parties and (3) the court below erred in its award of damages to the plaintiff.

As "the burden is on him who sets up unreasonableness as the basis of illegality as a defense in a suit to enforce a contract 'to show how and why it is unlawful' " (*Harris Calorific Company v. Marra,* 345 Pa. 464, 468, 29 A. 2d 64, and cases there cited; see, also, *Plunkett Chemical Company v. Reeve,* 373 Pa. 513, 515, 95 A. 2d 925), it follows that it was incumbent upon

Schaefer to show how and why the exclusive distribution agreement was unlawful. And, that, he failed to do. The appellant bottoms his argument of unreasonableness upon the premises that the restriction was greater than was required for the protection of the person for whose benefit the restraint was imposed and that it worked undue hardship on the person restricted: cf. Restatement, Contracts, §515. All that the appellant submits in this connection is that an exclusive, world-wide control of distribution was far broader than was reasonably required to insure Maxwell's interests since, at the time the contract was entered into, he was not engaged in the business of selling or distributing paint or spray-paint products, that he had no customers to retain or territory to protect and that, while the appellant by the contract assumed to relinquish his right to deal with other distributors, Maxwell did not engage to devote his best efforts to the promotion of sales of and markets for "Spritzit". The argument fails to stand up. The fact that Maxwell did not, in express terms, promise to devote his best efforts to the sale of "Spritzit" did not mean that he was not bound contractually to do so. As Judge CARDOZO aptly observed in his characteristic style in *Wood v. Lucy, Lady Duff-Gordon,* 222 N. Y. 88, 90-91, 118 N.E. 214,—"It is true that [plaintiff] does not promise in so many words that he will use reasonable efforts to place the defendant's indorsements and market her designs. We think, however, that such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view to-day. A promise may be lacking, and yet the whole writing may be 'instinct with an obligation' imperfectly expressed [citing cases]. If that is so, there is a contract." In the instant case, Maxwell promised

to forego distribution of products similar to "Spritzit" and, since his profits depended entirely on the volume of sales he was able to create for the product, it may fairly be inferred that all parties to the agreement fully intended and expected him to devote reasonable effort to the promotion of "Spritzit". And, that is what he did as the testimony discloses. In the relatively short time the contract was in force, he had expended some $15,000 of his own money in order to promote sales—a fact specifically adverted to in the opinion for the court en banc. Furthermore, a reading of Maxwell's testimony, which the court below implicitly accredited, reveals that he had worked diligently to create markets for "Spritzit".

Nor can it otherwise be said that the world-wide exclusive distribution contract was unreasonable. In *Harris Calorific Company v. Marra,* supra, we declared that,—"It is now the rule in this jurisdiction as well as most others that where a contract is limited as to time or space it is not ipso facto against public policy but it is necessary to make further inquiry and determine whether the restriction is reasonable [citing cases]." See, also, *Plunkett Chemical Company v. Reeve,* supra. As to space, the contract did give Maxwell the exclusive right to control the distribution of "Spritzit" throughout the world, but the contract was terminable by either party upon one year's written notice to such effect—an option which, as the court below found, Schaefer had chosen to exercise less than six months after the contract was executed. A one-year time limit is well within the requirements of reasonableness: see *Plunkett Chemical Company v. Reeve,* supra. The testimony, which the chancellor accredited, further showed that the contract was neither unreasonable nor did it unduly restrict Schaefer in his efforts to sell his product. The fact is that, at all times,

Schaefer had more orders than he was able to fill. Since he was unable to supply Maxwell's requisitions during the time the contract was operative, he is obviously in no position to assert that he was unreasonably deprived of the right to deal with other persons.

The appellant argues in the alternative that, even conceding the validity of the distribution contract, the evidence shows that the parties voluntarily abandoned the agreement of November 1, 1950, and, in the Spring of 1951, began doing business under new arrangements. That, however, is directly contrary to the supported and confirmed findings of the chancellor and nothing is better settled, nor more frequently reiterated, than that the findings of the chancellor, if supported by evidence and confirmed by the court en banc, have the weight of a jury's verdict and will not be disturbed on appeal: *Taylor v. Kaufhold,* 379 Pa. 191, 197, 108 A. 2d 713, and cases there cited. What the chancellor actually found with respect to the life of the agreement of November 1, 1950, was that Schaefer had breached it by not supplying Maxwell with the entire output of "Spritzit" (or "Lustre Spray" as the paint was later alternately known) between April 11, 1951, and April 11, 1952, which, of course, implies a finding that, during the specified period, the agreement was in force; and the record amply confirms the verity of such finding. Moreover, apart from Maxwell's accredited testimony that the distribution agreement had not been abandoned, there are two undisputed letters in the record from Maxwell to Kimbar Company (a trading name of Halpern and Schaefer) which so corroborate. In the one letter, dated April 25, 1951, Maxwell complained of sales of "Spritzit" (or "Lustre Spray") by the manufacturers to third persons and demanded an immediate accounting. In the other letter, dated June 14, 1951, he stated that "Relative to your letter of the

12th, our contract with you has been binding since November 1st, and as far as we are concerned is still in force. We reiterate we have specifically abided to the terms of the contract." The facts relied on by Schaefer to show an abandonment of the contract amount to no more than a factoring arrangement entered into by Schaefer with the knowledge, if not the approval, of Maxwell. As Schaefer himself testified, that arrangement was designed to obtain new capital for the manufacture of the paint.

The appellant's final contention is that the court below erred in awarding Maxwell compensatory damages in the aggregate amount of $20,700. With that assignment, we are disposed to agree, at least in the present state of the record. The chancellor found in his eighth finding that "The profits to [Maxwell] were $2.64 per case. [Schaefer] sold to others approximately five thousand cases, after taking into consideration that in the total amount sold to others was included the sales [made] with the approval of [Maxwell], and also the fact that a part so sold was between April 11, 1952, the date of termination, and April 3, 1953, the date of hearing. [Maxwell] thereby suffered damages in the amount of $13,200.00." However, the finding that 5,000 cases were sold by Schaefer in violation of the distribution agreement lacks evidence to support it. Indeed, the absence of evidence, from which the quantum of cases so sold could be deduced, is confirmed by the statement in the opinion for the court en banc (written by the chancellor) that "The only evidence as to loss of profits to [Maxwell] was [Schaefer's] own testimony, in which he admitted that he sold to others than [Maxwell] 13,000 cases. It is true that this is but an approximation, but who should know better than the defendant himself as to how many cases he sold to others than [Maxwell]. There was evidence

that in the 13,000 cases sold to others was included the sales [made] with the approval of [Maxwell]; and also that a part so sold was between April 11, 1952, the date of the termination of the contract, and February 24, 1953, the date of hearing; and therefore a finding that [Schaefer] sold to others 5000 cases is warranted under the evidence." Damages, of course, are never presumed; they must be proved by competent evidence: see *Rice v. Hill,* 315 Pa. 166, 172, 172 A. 289. True enough, Schaefer admitted the sale of some 13,000 cases to others than Maxwell, but, from that total, there must be subtracted such of those sales as were made with Maxwell's approval and also the portion of the 13,000 cases sold after the termination of the contract. As the record stands, there is no factual basis from which the chancellor could determine that, of the 13,-000 cases sold to others, 5,000 were sold in violation of the distribution agreement with Maxwell.

As to the additional $7,500 which the learned chancellor awarded Maxwell as damages: that item represented reimbursement for approximately one-half of the money expended by Maxwell in the promotion of the sale of "Spritzit". But, such expenditures were at Maxwell's personal expense to be recouped by him, if at all, from the larger profits to be derived by him from contemplated increased sales of the product. There is nothing in the contract which obligates Schaefer to reimburse Maxwell, upon the termination of the contract, for any part of his voluntary disbursements for promotional purposes. The aim of the law in awarding compensatory damages for breach of contract is to put the injured party in the position he would have been in had there been full performance of the contract throughout the period of its duration: see Restatement, Contracts, §329, Comment *a.* That is what Maxwell is entitled to and precisely what the chancellor at-

tempted to give him when he awarded him his lost profits on the cases of "Spritzit" sold by Schaefer in violation of the distribution agreement. But, to augment the sum so due Maxwell, whatever that may prove to be, by an additional award for one-half of the promotional expense voluntarily incurred by him would seem to be a pro tanto duplication of damages. However, as the case goes back for more specific findings and conclusions in respect of the damages due the plaintiff, we need say nothing more now about that item.

The decree of the court below is vacated to the extent of its award of damages to the plaintiff; and the cause is remanded for the taking of such additional evidence, as may be necessary, to the end that more specific findings as to the damages due the plaintiff can be made by the chancellor and an award entered accordingly; the costs to be borne by the appellant.