507 A.2d 339

**PRINCETON SPORTSWEAR CORPORATION, Appellant,**

v.

**H & M ASSOCIATES, Sidney Becker and Leonard Becker, Appellees.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 1985.

Decided March 27, 1986.

Carl M. Mazzocone, Lewis Kates, Philadelphia, for appellant.

Robert B. Bodzin, Robert H. Malis, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

LARSEN, Justice.

This case involves a dispute between a landlord and a tenant, initiated by the landlord's refusal to restore electricity, heat and elevator service to the tenant's building after a

fire in an adjacent building resulted in a shut-down of those services. The trial court, sitting as chancellor, found in favor of the tenant, appellant herein, and against the landlord, appellees herein, and awarded damages in the amount of $600,000. On appeal, the Superior Court reversed, 335 Pa.Super. 381, 484 A.2d 185, and appellant now asserts, inter alia,[1] that the Superior Court exceeded the proper scope of review when it overturned the trial court's decision.

Pursuant to the terms of a lease agreement dated May 2, 1973, appellant, Princeton Sportswear Corporation, became a tenant in Building No. 12 of a multi-building industrial complex owned by appellee, H & M Associates, a partnership formed by appellees Leonard Becker and Sidney Becker. The lease provided that appellees would provide electricity, heat and elevator service at no extra cost to appellant.

On March 30, 1978, a fire severely damaged the building which housed the sources of heat and electricity for the complex, resulting in a loss of those utilities and of elevator service in the entire complex. Subsequently, on April 4, 1978, appellees notified appellant that they were terminating the lease but that they would allow appellant to remain on the premises on a month-to-month basis, and further, that they no longer intended to provide electricity, heat or elevator service. Appellant responded on April 7, 1978, by filing in the Philadelphia Court of Common Pleas a petition for a preliminary injunction seeking to compel appellees to immediately restore electricity, heat and elevator service to Building No. 12, and a complaint in equity alleging that the fire had occurred because of appellees' negligent maintenance of the complex and that appellees were thus responsible for the loss of utilities and had breached the lease by refusing to restore those utilities.

1. Appellant also asks this Court to determine whether an owner of multiple buildings within a single complex owes a duty to the tenants of one building to reasonably maintain adjacent buildings so that they do not pose a hazard. In light of our disposition of the case, however, we do not reach this issue.

On April 9, 1978, at a hearing on appellant's petition for a preliminary injunction, the parties entered into a stipulation whereby appellees agreed to allow appellant to make arrangements with the electric company for the restoration of electricity to Building No. 12 without prejudice to appellant's right to seek reimbursement from appellees for the expenses incurred. Even though temporary electric service was restored by the end of April, 1978, the inadequacy of that service and the lack of heat forced appellant to relocate in October, 1978.

Appellant thereafter amended its original complaint in equity, seeking damages for lost profits (due to the temporary discontinuation of its operations [2] during April, 1978) and for expenses incurred in relocating. After a hearing, the trial court, sitting as chancellor, made detailed findings of fact and entered a decree nisi. The trial court concluded that appellees' negligent maintenance of the complex had been responsible for the fire and that, thus, appellees were liable for breach of contract in failing to restore electricity, heat and elevator service to appellant's building after the fire. Damages were assessed at $600,000. Appellees' exceptions to the decree were denied.

On appeal, the Superior Court reversed, holding that a certain clause in the lease exculpated appellees from liability. We granted appellant's petition for allowance of appeal and we now reverse.

■ Appellant contends first that appellees' failure to expressly raise the exculpatory clause, upon which the Superior Court relied, in appellees' written exceptions to the trial court's adjudication constitutes a waiver of that issue. We do not agree. The validity and effect of the clause were raised and exhaustively discussed by both parties in their motions for summary judgment, trial memoranda, and briefs in support of and in opposition to appellees' exceptions to the trial court's adjudication. Therefore, appellees

**2.** Appellant was engaged in the silk-screening and processing of T-shirts, sweatshirts and sportswear items sold primarily to college bookstores.

have not waived their right to raise the exculpatory clause issue on appeal.

Since the exculpatory clause issue has been preserved for review, we now turn to a consideration of the validity and enforceability of the clause. In general, an exculpatory clause is valid if:

(a) "it does not contravene any policy of the law, that is, if it is not a matter of interest to the public or state" ...; (b) "the contract is between persons relating entirely to their own private affairs" ...; (c) "each party is a free bargaining agent" and the clause is not in effect "a mere contract of adhesion whereby [one party] simply adheres to a document which he is powerless to alter, having no alternative other than to reject the transaction entirely."

. . . .

*Employers Liability Assurance Corp., Ltd. v. Greenville Business Men's Association*, 423 Pa. 288, 291–92, 224 A.2d 620, 622–23 (1966) (citations omitted). Furthermore, before a generally valid exculpatory clause will be interpreted and construed to relieve a person of liability for his own or his servants' or agents' acts of negligence, it must

"spell out the intention of the parties with the greatest of particularity" ... and show the intent to release from liability "beyond doubt by express stipulation" and "[n]o inference from words of general import can establish it"

. . . .

*Id.* 423 Pa. at 292–93, 224 A.2d at 623 (citations omitted).

In the instant case, the exculpatory clause in question is found in paragraph 11(a) of the printed lease and provides that:

11(a). Lessee agrees to be responsible for and to relieve and hereby *relieves the Lessor from all liability by reason of any injury or damage to any person or property in the demised premises,* whether belonging to the Lessee or any other person, *caused by any fire,* breakage or leakage *in* any part of portion of the demised premises, or *any part or portion of the building of which the demised premises is a part,* or from water,

rain or snow that may leak into, issue or flow from any part of the said premises, or of the building of which the demised premises is a part, or from the drains, pipes, or plumbing work of the same, or from any place or quarter, whether such breakage, leakage, injury or damage be caused by or result from the negligence of Lessor or his servants or agents or any person or persons whatsoever.

(Emphasis added.) Paragraph 11(a) is modified by a type-written addendum prepared by appellant's counsel, which provides that:

34. Notwithstanding the provisions of paragraph 11(a) of the lease agreement the negligence of the lessor, his servants or agents shall be excepted therefrom.

■ Applying the above standards, we hold that the ex-culpatory clause is valid and enforceable. The clause does not contravene any policy of the law, a commercial lease is involved which relates entirely to the parties' own private affairs, and there was no disparity in bargaining power between the parties (the record shows that the clause had been reviewed, negotiated and modified by both parties and their counsel). Moreover, the clause, as modified, spells out the intention of the parties with particularity, evidencing a clear and unambiguous intent to release appellees from liability for damages caused by fire unless such fire was caused by negligence on the part of appellees.

At this point we turn to appellant's second contention, that the Superior Court exceeded the proper scope of review in reversing the decision of the trial court. After conclud-ing that the exculpatory clause was valid and enforceable and that it clearly exonerated appellees from liability unless the March 30, 1978 fire was caused by negligence on the part of appellees, the Superior Court went on to apply the clause to release appellees from liability based on its conclu-sion that "the lower court specifically found that [appel-lees'] conduct was not tortious." Appellant contends that in arriving at this conclusion, the Superior Court exceeded the proper scope of review. We agree.

It is well-settled that a trial court's findings of fact, if supported by sufficient evidence, are binding on an appellate court in reviewing the trial court's decision. *Yuhas v. Schmidt*, 434 Pa. 447, 258 A.2d 616 (1969). This maxim clearly was not followed in the instant case.

To begin with, the finding of the trial court that appellees' conduct "was not tortious" was made in determining that appellant was not entitled to punitive damages,[3] and was completely unrelated to the trial court's conclusion that appellant was entitled to compensatory damages. It is clear from the context of its statement that, in finding appellees' conduct "not tortious," the trial court was referring to appellees' failure to restore the utilities, which failure had nothing to do with the cause of the fire, and *not* to appellees' failure to maintain the complex.

■ On the precise question of whether appellees negligently failed to maintain the property and thereby caused the injury to appellant, the trial court clearly found that appellees were negligent and that their negligence was the proximate cause of appellant's injury. In this respect, the trial court made the following findings of fact:

8. The [appellees] under their agreement with the [appellant] had the obligation of maintaining the demised premises in a satisfactory condition including, but not limited to maintaining the elevators.

9. Commencing in early 1977, the demised premises was permitted by [appellees] to fall into disrepair.

10. The [appellees] dismantled and took down the perimeter fencing and withdrew their guards who had restricted access to the demised premises and the industrial complex of which it was a part.

**3.** In addition to suing for compensatory damages, appellant also asked for punitive damages, claiming that appellees' failure to restore utilities to its building exhibited a wanton and reckless disregard for appellant. In denying this claim, the trial court stated: "the acts of [appellees], while a breach, were not in themselves tortious."

11. The [appellees] ceased to maintain within the demised premises its elevators, roof, entrance ways and sprinkler system.

12. The [appellees] were knowledgeable owners of rental real estate and knew that their failures and refusals to maintain the premises not only were in knowing violation of their obligation as lessors and in knowing violation of the rights of [appellant] but that their failures made the demised premises and the complex of which it was a part an attractive target for vandals and other unauthorized persons.

13. The [appellees] recognized that [appellant] had a right to elevator service and required the same for its operations by permitting [appellant] to pay directly for elevator repairs and deduct the cost from rent until 1978.

14. These failures and refusals by [appellees] resulted and culminated in a fire and conflagration on March 30, 1978.

Reproduced Record at 1281. These findings clearly support the trial court's conclusion that appellees' conduct negligently caused appellant's injury. The Superior Court completely ignored these findings, however.

Finally, a review of the record shows that the trial court's findings are supported by sufficient evidence. At trial, Morton Fischer, president of appellant, testified that when appellant moved into the complex, it was almost completely occupied and was well-maintained. N.T., May 5, 1981 at 151. Anthony Fischer, secretary of appellant, testified that when appellant moved into the complex, there was a guard in a guard house who restricted access to the complex, but that he subsequently retired and was not replaced. N.T., December 16, 1980 at 95. Bernie Green, a maintenance man employed by appellees, testified that when appellant moved into the complex there had been a fence around the property, but that it had been torn down and had not been replaced. N.T., May 7, 1981 at 7.150.

Anthony Fischer also testified that in 1977, all of the tenants of Building No. 1 (the building which housed the

sources of heat and electricity for the complex) had vacated the premises and, in so doing, had left the doors and windows of the building open. N.T., December 15, 1980 at 108. Mr. Fischer testified that he had thereafter seen vandals in Building No. 1 and had so reported to Sidney Becker, one of the appellees, but had been told by Mr. Becker that nothing would be done about it. *Id.* at 111. He also testified that he had seen vandals on the roof of Building No. 1 on the day of the fire. *Id.* at 96. Finally, the fire marshall who investigated the fire reported that the cause of the fire was arson. N.T., May 4, 1981 at 4.61.

Therefore, since the relevant findings of the trial court are supported by sufficient evidence, the Superior Court was bound by those findings, and thus exceeded the proper scope of review in ignoring them.

Accordingly, the order of the Superior Court is reversed, and the case is remanded to that court for consideration of the remaining issues raised before that court.

FLAHERTY and ZAPPALA, JJ., join in this opinion.

NIX, C.J., filed a concurring opinion joined by McDERMOTT, J.

HUTCHINSON, J., filed a concurring opinion joined by PAPADAKOS, J.

NIX, Chief Justice, concurring.

I agree with the mandate of the majority opinion that remands the case to the Superior Court for further consideration. I am constrained to write because the analysis offered by the majority obfuscates rather than clarifies the error that justifies the remand.

Neither paragraph 11(a) nor its qualifier, paragraph 34, are pertinent to the instant inquiry.[1] The claimed loss did

1. Paragraph 11(a) provides in pertinent part:
   Lessee agrees to be responsible for and to relieve and hereby relieves the Lessor from all liability by reason of any injury or damage to any person or property in the demised premises, whether belonging to the Lessee or any other person, caused by any fire, . . .

not result from the fire since the premises occupied by appellant was not physically affected by the fire. Here the asserted cause for the loss was appellees' (landlords') refusal to restore electrical service to the premises occupied by appellant and the refusal to make the requisite repairs to the heating and sprinkler system. The fire was at best an inoperative cause; it was appellees' refusal to respond after the fire and the consequences of that refusal which form the basis for appellant's claim in assumpsit. The following excerpts from the Chancellor's opinion make clear his basis for the finding of liability.

It is plaintiff's [appellant's] position that the lease was in full force and effect and that as such defendants [appellees] were bound to restore all utilities in a reasonable time.

Slp. opinion pg. 7.

After considering a provision that terminated the lease if the damage was such that, "... the same cannot be repaired or restored within a reasonable time...", the court continued as follows:

The court has found that the lease specifically spelled out the causes for the termination of the lease. Those conditions were not met. Therefore, the lease remains in force against both parties.

We must now consider what were the obligations of the defendants under the lease. The lease gives the Lessor the option to repair notwithstanding the damage by giving notice to the tenant of his intention to do so within thirty (30) days of its notice of the damage or destruction. No such notice was given. Clearly the restoration was not completed within thirty (30) days or by any period

or any part or portion of the building of which the demised premises is a part, ... whether such ... injury or damage be caused by or result from the negligence of Lessor or his servants or agents or any person or persons whatsoever.

....

Paragraph 34 provides:

Notwithstanding the provisions of paragraph 11(a) of the lease agreement the negligence of the lessor, his servants or agents shall be excepted therefrom.

that might be considered reasonable. Under our law and the terms of the lease, the building was not so destroyed as to terminate the lease. As the lease remained in force, the landlord was obligated to continue to provide the services as agreed in the lease. The failure to do so was not because it could not, but rather the defendants chose not to make repairs.

Attention must now turn to the failure of the defendants to provide the services required under the lease. The lease would have excused the defendants if the reason for the interruption of the services were due to the repairs. However the failure was not due to repairs or restoration. The defendants have shown no valid excuse for their failure, except the argument that the building was too costly to repair. They are therefore in breach of the lease agreement and the question presented is the measure of damages for that breach.

It is therefore clear that the theory of liability sustained by the trial court was that of assumpsit for appellant's failure to perform in accordance with the terms of the lease. Clause 11(a) is therefore clearly not applicable. The Order of the Superior Court should be reversed and the matter remanded to that court to address the remaining issues. *See* 335 Pa.Super. 381, 388 n. 4, 484 A.2d 185, 189 n. 4 (1984).

McDERMOTT, J., joins in this concurring opinion.

HUTCHINSON, Justice, concurring.

I concur in the result reached by the opinion announcing the judgment of the Court but disagree with its analysis.

In finding liability, Mr. Justice Larsen relies upon the lease's exculpatory and termination clauses. However, I do not believe that either is applicable here under the meaning of the term "demised premises" in this lease.[1] The lease

1. The Chancellor found that the third floor of Building No. 12 was the demised premises. Superior Court states without explanation that "there can be no question that the damaged power center ... consti-

seems to define the demised premises as "third floor in building No. 12, as outlined in the attached plan." If this is correct, neither paragraph 11 nor 12 would be applicable.

Paragraph 12 of the lease permits the lessor to terminate the lease if the demised premises have been "destroyed or damaged by fire or other casualty." The fire occurred in Building No. 1. If the demised premises were confined to Building 12, which was not damaged, lessor's right to terminate would not arise. Applying the same definition of "demised premises," I believe that paragraph 11 of the lease is likewise inapplicable here. That paragraph "relieves the lessor from all liability by reason of any injury or damage to any person or property in the demised premises[.]" There was no injury or damage to property in the demised premises, if defined as Building 12; only lessee's business was damaged. Paragraph 12 further requires that the injury or damage be "caused by any fire, breakage or leakage in any part or portion of the demised premises, or any part or portion of the *building* of which the demised premises is a part" (emphasis supplied). The fire occurred in a different building than the demised premises; therefore, this clause cannot relieve the lessor of liability. Paragraph 34 which merely limits paragraph 11 is, accordingly, also of no moment. Nevertheless, I do not believe it is necessary to remand for consideration of the meaning of demised premises; I believe that Common Pleas' liability finding is supportable on other grounds.

To me, the determinative issue is what the law of contracts supposes the parties agreed upon concerning the supply of electricity, heat and water in the event of their disruption. The lease does not speak on this issue. Should we suppose an agreement that these services would be provided unconditionally or instead an understanding that they would be provided from the existing plant in Building No. 1? If the agreement was for an unconditional supply of these services, the lessor is clearly in breach. On the other hand, if continuing service from the existing central

tuted a 'part or portion of the building of which the demised premises [was] a part.' "

plant was assumed by the parties, we must consider whether the lessor's non-performance would be excused by the doctrine of impossibility or frustration. Under that legal concept, the lessor's failure to provide continuing service also results in a breach on the facts found by Common Pleas.

Under Pennsylvania law, impossibility excuses non-performance if, through no fault of either party, the subject matter of the agreement has been destroyed. *West v. Peoples First National Bank & Trust*, 378 Pa. 275, 106 A.2d 427 (1954). In this case, Common Pleas determined that the destruction of the plant in Building No. 1 was caused by lessor's fault; its negligence caused the fire. This finding is supported by the evidence, which shows that lessor failed to maintain the level of security in effect at the beginning of the lease and generally allowed the condition of the premises to deteriorate. Thus, lessor's non-performance is not excused by impossibility and the lessee is entitled to damages for breach of contract. The lease is a contract. With some exceptions not material here, the usual contract measure of damages applies. *Pugh v. Holmes*, 253 Pa.Super. 76, 384 A.2d 1234 (1978), *affirmed* 486 Pa. 272, 405 A.2d 897 (1979). The damages recoverable for breach of contract are those which will, as nearly as possible, put the injured party in the same position it would have been in had the contract been fully performed. *Maxwell v. Schaefer*, 381 Pa. 13, 112 A.2d 69 (1955). They are measured by the difference between the rental in the breached lease and the rental the lessee would have to pay at current market for equivalent alternate premises during the remaining term of the lease, plus reasonable relocation expenses and demonstrable profits lost because of business interruption resulting from the necessity of relocating.

Therefore, I differ with the analysis contained in the opinion announcing the judgment of the Court. I concur in the mandate reversing Superior Court's order and remanding for further proceedings.

PAPADAKOS, J., joins in this concurring opinion.