J. A30039/17

2018 PA Super 89

| | | |
|---|---|---|
| PATRICK KIBLER AND KATHRYN KIBLER, HUSBAND AND WIFE, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| v. | : | |
| | : | |
| BLUE KNOB RECREATION, INC., A PENNSYLVANIA CORPORATION, T/D/B/A BLUE KNOB ALL SEASONS RESORT, AND BLUE KNOB RESORT, INC., A PENNSYLVANIA CORPORATION | : | No. 903 WDA 2017 |

Appeal from the Order, May 24, 2017,
in the Court of Common Pleas of Bedford County
Civil Division at No. 2015-183

BEFORE:  BOWES, J., STABILE, J., AND FORD ELLIOTT, P.J.E.

OPINION BY FORD ELLIOTT, P.J.E.:                    FILED APRIL 19, 2018

Patrick and Kathryn Kibler (collectively "appellants"[1]) appeal from the May 24, 2017 order of the Court of Common Pleas of Bedford County granting Blue Knob Recreation, Inc. and Blue Knob Resort, Inc.'s (hereinafter, collectively "defendants") motion for summary judgment.  After careful review, we affirm.

The trial court provided the following synopsis of the facts:

On March 21, 2014, [appellant] applied for a season ski pass for the 2014-2015 ski season at Blue Knob Ski Resort.  [Appellant] signed and dated the season

---

[1] For clarity, we will refer to Mr. Kibler as "appellant" throughout this memorandum.

pass/application agreement, which contained information and guidelines about the Blue Knob season pass. The bottom half of said document contains the following exculpatory language:

> PLEASE READ THE FOLLOWING
> BEFORE SIGNING!!
> Snowboarding, skiing and other snow related activities, like many other sports, contain inherent risks including, but not limited to, the risk of personal injury, death or property damage, which may be caused by: variation in terrain or weather conditions, surface or subsurface, snow, ice, bare spots, thin cover, moguls, ruts, bumps, forest growth, debris, other persons using the facilities, branches, trees, roots, stumps, rocks, and other natural or man made objects that are incidental to the provision or maintenance of the facility. For the use of Blue Knob Ski Area, the holder assumes all risks of injury and releases Blue Knob Recreation from all liability THEREFORE: Not withstanding the foregoing, if I sue Blue Knob Recreation ET AL I agree that I will only sue it, whether on my own behalf or on behalf of a family member, in the Court of Common Pleas of Bedford County or in the United States District Court for the District of Pittsburgh, Pennsylvania and further agree that any and all disputes which might arise between Blue Knob Recreation ET AL and myself shall be litigated exclusively in one of said courts.

See Blue Knob All Seasons Resort Information/Guidelines.

On December 21, 2014 at 9:00 a.m., [appellant] arrived at Blue Knob to ski with friends. Prior to arriving at the resort, [appellant] learned that five slopes were open to ski. [Appellant] eventually would ski on two of these five open slopes. After skiing down

a slope identified as "Lower Mambo," [appellant] stopped to look for his skiing companions, who were snowboarding on another slope. In an attempt to rejoin them without walking back up the slope, [appellant] intended to ski toward the middle of "Lower Mambo Valley" in order to reach a ski lift. While traversing this area, [appellant] ran over "trenches" he avers were four-to-six inches deep and six-to-eight inches wide, which extended halfway across the ski slope. Defendants' employees identified the trenches as being caused by an all-terrain-vehicle operated by a resort employee. [Appellant] fell when encountering these trenches, causing him to fracture his left tibia and fibula.

Trial court opinion, 5/23/17 at 2-3.

On February 15, 2015, appellants filed a civil complaint with the trial court sounding in negligence. Following discovery, defendants filed a motion for summary judgment with an accompanying memorandum of law on January 23, 2017. Appellants filed a motion for summary judgment on March 17, 2017. Oral arguments were held before the trial court on April 18, 2017. On May 24, 2017, the trial court granted defendants' motion for summary judgment, dismissing appellants' complaint with prejudice, and denied appellants' motion for summary judgment.

On June 16, 2017, appellants filed a timely notice of appeal with this court. The trial court ordered appellants to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), and appellants complied on July 18, 2017. The trial court filed an opinion on August 10, 2017, pursuant to Pa.R.A.P. 1925(a) in which it incorporated the content of

its May 24, 2017 order and opinion granting defendants' motion for summary judgment.

Appellants raise the following issues for our review:

A. Was the hazard encountered by [appellant] inherent to the dangers of downhill skiing, when [defendants'] Director of Maintenance testified that the hazard was out of the ordinary, not common, and [appellant] should not have expected to encounter the hazard?

B. Is the Blue Knob All Seasons Resort 2014-2015 Season Pass Holder Information/Guidelines document a valid exculpatory release, where the top half of the document only discusses the requirements to be a season pass holder, and the lower half is ambiguous, the word "releases" is located 75% down the page, lacks conspicuity, without print of a size and boldness that draws the attention of an ordinary person, and where no evidence exists that [appellant] read this document?

C. Is a claim for injuries caused by the grossly negligent and/or reckless acts of a ski resort barred by an alleged exculpatory sentence in Blue Knob's season pass?

D. Did [appellant] voluntarily assume the risk of injury when he encountered a hazard at [defendants'] resort for which he was unaware, and for which [defendants'] Director of Maintenance testified that [appellant] had no reason to anticipate or know of the hazard's existence?

Appellant's brief at 4-5.[2]

In reviewing an appeal from the trial court's granting of a motion for summary judgment, we are governed by the following standard of review:

> [O]ur standard of review of an order granting summary judgment requires us to determine whether the trial court abused its discretion or committed an error of law. Our scope of review is plenary. In reviewing a trial court's grant of summary judgment, we apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. All doubts as to the existence of a genuine issue of a material fact must be resolved against the moving party.
>
> * * *
>
> Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions.

Petrina v. Allied Glove Corp., 46 A.3d 795, 797-798 (Pa.Super. 2012) (internal citations omitted).

---

[2] Appellants' four issues address two overarching issues: voluntary assumption of risk and the validity of the release attached to the season pass provided by defendants. Accordingly, for the purposes of our review, we shall address issues A and D together and issues B and C together.

Rule of Civil Procedure 1035 governs motions for summary judgment and provides, in relevant part, as follows:

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law
>
> (1) Whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or
>
> (2) If, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

Pa.R.C.P. 1035.2. This Court has explained the application of this rule as follows:

> Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of a cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or

> defense which in a jury trial would require the issues to be submitted to a jury. In other words, whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense, which could be established by additional discovery or expert report and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. Thus, a record that supports summary judgment either (1) shows the material facts are undisputed or (2) contains insufficient evidence of facts to make out a prima facie cause of action or defense.

Petrina, 46 A.3d at 798.

Criswell v. Atlantic Richfield Co., 115 A.3d 906, 909-910 (Pa.Super. 2015).

## Voluntary Assumption of the Risk

Appellants' first and fourth issues on appeal address the voluntary assumption of the risk associated with downhill skiing. The General Assembly directly addressed this issue when it passed the Pennsylvania Skier's Responsibility Act (hereinafter, "the Act"). The Act provides, in relevant part,

> (c) Downhill skiing--
>
> (1) The General Assembly finds that the sport of downhill skiing is practiced by a large number of citizens of this Commonwealth and also attracts to this Commonwealth large numbers of nonresidents significantly contributing to the economy of this Commonwealth. It is recognized that as in some other sports, there are inherent risks in the sport of downhill skiing.

> > (2) The doctrine of voluntary assumption of the risk as it applies to downhill skiing injuries and damages is not modified by subsections (a) and (a.1).[3]

42 Pa.C.S.A. § 7102(c).

In light of the Act, our supreme court established the following standard when reviewing grants of summary judgment in cases involving downhill skiing:

> First, this Court must determine whether [appellant] was engaged in the sport of downhill skiing at the time of [his] injury. If that answer is affirmative, we must then determine whether the risk [encountered] is one of the "inherent risks" of downhill skiing, which [appellant] must be deemed to have assumed under the Act. If so, then summary judgment was appropriate because, as a matter of law, [appellant] cannot recover for [his] injuries.

Hughes v. Seven Springs Farm, Inc., 762 A.2d 339, 344 (Pa. 2000). In the context of downhill skiing, our supreme court stated that both common law assumption of the risk doctrine and the court's decision in Hughes "direct that inherent risks are those that are 'common, frequent, or expected' when one is engaged in a dangerous activity, and against which the defendant owes no duty to protect." Chepkevich v. Hidden Valley Resort, L.P., 2 A.3d 1174, 1187 n.14 (Pa. 2010).

---

[3] Subsections (a) and (a.1) address contributory negligence and joint and several liability.

In the instant appeal, it is beyond dispute that appellant was engaged in the sport of downhill skiing at the time of his injury. Indeed, as noted by the Hughes court,

> Obviously, the sport of downhill skiing encompasses more than merely skiing down a hill. It includes those other activities directly and necessarily incident to the act of downhill skiing. Such activities include boarding the ski lift, riding the lift up the mountain, alighting from the lift, skiing from the lift to the trail and, after a run is completed, skiing towards the ski lift to start another run or skiing toward the base lodge or other facility at the end of the day.

Hughes, 762 A.2d at 344. Therefore, our paramount inquiry is whether encountering wheel ruts on a ski slope created by an ATV operated by an employee of defendants is an inherent risk to downhill skiing.

Appellants make the argument that operating an ATV up the middle of a ski slope is not an inherent aspect of the sport, and should therefore not be considered an inherent risk as contemplated by the Act. (See appellants' brief at 32.) Appellants specifically cite the deposition testimony of Craig Taylor, defendants' director of maintenance, in which Mr. Taylor stated that it would not be common or expected by a skier to encounter wheel ruts made by an ATV on the ski slope. (See notes of testimony, 10/21/15 at 28.) Defendants aver that the cause of the alleged condition is not relevant to whether the condition itself, in this case wheel ruts left by operating an ATV up the middle of a ski slope, constitutes an inherent risk associated with downhill skiing.

As noted by the Chepkevich court, "Pennsylvania's Act is unusual in its brevity and failure to give any definition of an 'inherent' risk of skiing," especially when compared to other states in which skiing constitutes a "significant industry." Chepkevich, 2 A.3d at 1188 n.15. Of the states referenced by the Chepkevich court, the most instructive is New York.

In Schorpp v. Oak Mountain, LLC, 143 A.D.3d 1136 (N.Y. App. Div. 2016), the New York Supreme Court, Appellate Division[4] reversed the trial court's denial of summary judgment in a negligence cause of action. Id. at 1137. The plaintiff in this case "skied into a 'depression' that was filled with snow. The skis got caught in the depression causing [the plaintiff] to flip over and fall out of his skis." Id. The appellate court held that under New York's assumption of the risk doctrine as it pertains to downhill skiing, "an individual 'assumes the inherent risk of personal injury caused by ruts, bumps or variations in the conditions of the skiing terrain.'" Id., quoting Ruepp v. West Experience, 272 A.D.2d 673, 674 (N.Y. App. Div. 2000) (emphasis added). Unlike its Pennsylvania counterpart, the New York State Legislature specifically identified ruts as an inherent risk of downhill skiing. N.Y. General Obligations Law § 18-101.

Given that our cases do not directly address an injury incurred while engaged in downhill skiing caused by wheel ruts in the terrain on the slope, we find the New York statute and case law to be the most instructive in the

---

[4] This court is the intermediate court of appeals in New York.

instant appeal. Moreover, the language of the release signed by appellant, which we further discuss infra, is nearly identical to the language of the New York statute.[5] We agree with the holding of the Appellate Division of the New York Supreme Court, and find that wheel ruts in the terrain are an inherent risk to the sport of downhill skiing. Accordingly, we hold that appellants cannot recover damages as a matter of law, and that the trial court properly granted defendants' motion for summary judgment.

---

[5] The New York statute provides, in relevant part:

§ 18-101. Legislative purpose

The legislature hereby finds that alpine or downhill skiing is both a major recreational sport and a major industry within the state of New York. The legislature further finds: (1) that downhill skiing, like many other sports, contains inherent risks including, but not limited to, the risks of personal injury or death or property damage, which may be caused by variations in terrain or weather conditions; surface or subsurface snow, ice, bare spots or areas of thin cover, moguls, ruts, bumps; other persons using the facilities; and rocks, forest growth, debris, branches, trees, roots, stumps or other natural objects or man-made objects that are incidental to the provision or maintenance of a ski facility in New York state . . . .

N.Y. General Obligations Law § 18-101.

## Validity of Release[6]

Appellants' second issue pertains to the release appellant signed when he purchased his season pass. Specifically, appellant avers that the release in question is "not a valid exculpatory release" due to the fact that the release is ambiguous, the release is "without print of a size and boldness that draws the attention of an ordinary person," and there is no evidence that appellant actually read the release. (Appellants' brief at 33.)

When considering the validity of exculpatory releases, we are governed by the following standard:

> It is generally accepted that an exculpatory clause is valid where three conditions are met. First, the clause must not contravene public policy. Secondly, the contract must be between persons relating entirely to their own private affairs and thirdly, each party must be a free bargaining agent to the agreement so that the contract is not one of adhesion. *Princeton Sportswear Corp. v. H & M Associates*, 507 A.2d 339 (Pa. 1986); *Employers Liability Assurance Corp. v. Greenville Business Men's Association*, 224 A.2d 620 (Pa. 1966). In *Dilks v. Flohr Chevrolet*, 192 A.2d 682 (Pa. 1963), [our supreme court] noted that once an exculpatory clause is determined to be valid, it will, nevertheless, still be unenforceable unless the language of the parties is clear that a person is being relieved of liability for his own acts of negligence. In interpreting such clauses

---

[6] As noted by Justice Baer in his concurring opinion in *Chepkevich*, a review of the release issued by defendants and signed by appellant is not wholly necessary. *Chepkevich*, 2 A.3d at 1198 (Baer, J., concurring). The majority stated that, "consideration of alternative holdings is subject to prudential concerns, and we believe there are prudential concerns to consider the Release here." *Id.* at 1188 n.16. We will follow the lead of the majority and analyze both issues as they have both been briefed and argued before this court.

we listed as guiding standards that: 1) the contract language must be construed strictly, since exculpatory language is not favored by the law; 2) the contract must state the intention of the parties with the greatest particularity, beyond doubt by express stipulation, and no inference from words of general import can establish the intent of the parties; 3) the language of the contract must be construed, in cases of ambiguity, against the party seeking immunity from liability; and 4) the burden of establishing the immunity is upon the party invoking protection under the clause. Dilks, 192 A.2d at 687.

Topp Copy Products, Inc. v. Singletary, 626 A.2d 98, 99 (Pa. 1993), cited by Chepkevich, 2 A.3d at 1189.

In the context of exculpatory releases used for downhill skiing, we find the rationale behind the Chepkevich court's decision to be highly instructive to the instant appeal.[7]

---

[7] The release before the Chepkevich court was printed on an 8½ by 11-inch sheet of paper entitled "RELEASE FROM LIABILITY" and contained the following language:

> Skiing, Snowboarding, and Snowblading, including the use of lifts, is a dangerous sport with inherent and other risks which include but are not limited to variations in snow and terrain, ice and icy conditions, moguls, rocks, debris (above and below the surface), bare spots, lift towers, poles, snowmaking equipment (including pipes, hydrants, and component parts), fences and the absence of fences and other natural and manmade objects, visible or hidden, as well as collisions with equipment, obstacles or other skiers. . . . All the risks of skiing and boarding present the risk of serious or fatal injury. By accepting this Season Pass I agree to accept all these risks and agree not to sue Hidden Valley Resort or their employees if injured while using their facilities regardless of any negligence on their part.

> As we have stated, downhill skiing . . . is a voluntary and hazardous activity, and that fact is acknowledged in the Act as discussed above. Moreover, an exculpatory agreement conditioning the use of a commercial facility for such activities has not been construed as a typical contract of adhesion. The signer is under no compulsion, economic or otherwise, to participate, much less to sign the exculpatory agreement, because it does not relate to essential services, but merely governs a voluntary recreational activity. The signer is a free agent who can simply walk away without signing the release and participating in the activity, and thus the contract signed under such circumstances is not unconscionable. Moreover, the absence of a definition or illustration of negligence does not render this Release an invalid contract of adhesion; that factor simply does not relate to the concerns implicated by adhesion contracts.

Chepkevich, 2 A.3d at 1191 (internal citations omitted).

## Facial Validity

Similar to the Chepkevich court, we must first look to the facial validity of the release. In Chepkevich, our supreme court found that the release signed by the plaintiff did not "contravene any policy of the law. Indeed, the clear policy of this Commonwealth, as articulated by the Act, is to encourage the sport [of downhill skiing] and place the risks of skiing squarely on the skier." Id., citing 42 Pa.C.S.A. § 7102(c)(2). The court also stated that, "Pennsylvania courts have upheld similar releases respecting skiing and other inherently dangerous sporting activities." Id. (collecting cases). Finally, our

---

Chepkevich, 2 A.3d at 1176.

supreme court held that the release the plaintiff signed was a contract between Hidden Valley and the plaintiff, "relating to their private affairs, specifically [the plaintiff's] voluntary use of the resort's facilities." Id.

Our discussion in the instant appeal is comparable to the analysis employed by the Chepkevich court. Here, the release signed by appellant does not contravene any policy of the law. Similar to the release used by defendant Hidden Valley in Chepkevich, the release before us relates to the private affairs of appellant and defendants--namely, appellant's voluntary use of defendants' facilities. Accordingly, we find that the release signed by appellant is facially valid.

### Enforceability

Similar to the Chepkevich court, we must now look to the release's enforceability. "[T]he Topp Copy/Employers Liability standard requires us to construe the release strictly against [defendants] to determine whether it spells out the intention of the parties with particularity and shows to the intent to release [defendants] from liability by express stipulation, recognizing that is [defendants'] burden to establish immunity." Id., citing Topp Copy, 626 A.2d at 99.

In the instant appeal, appellants aver that the release was ambiguous, lacked conspicuity, and "was without print of a size and boldness that draws the attention of an ordinary person." (Appellant's brief at 33.) Appellants

further aver that there is no evidence that appellant read the release before signing it. (Id.) We shall address each of these claims individually.

Appellants first aver that the language of the release was ambiguous. Specifically, appellants allege that the release failed to "clearly and unequivocally intend for the defendant[s] to be relieved from liability, using language understandable to an ordinary and knowledgeable person so participants know what they have contracted away." (Id. at 39.) Appellants then allege that the release failed include any reference to the risk encountered by appellant. (Id. at 43.) Appellants specifically argue that "the risk [appellant] encountered, i.e., deep and wide frozen trenches in the middle of a beginner's slope, are not stated because it is nonsensical to contend such a serious hazard is inherent to the sport." (Id.) This argument misses the mark. To the contrary, as noted supra, one of the inherent risks explicitly referenced in the release is the presence of ruts on the ski slope. Merriam-Webster defines "rut" as "a track worn by a wheel or by habitual passage." Merriam-Webster.com. Merriam-Webster, n.d. Web. 2 Jan. 2018. Roget's Thesaurus identifies "trench" as a synonym of "rut." Thesaurus.com. Roget's 21st Century Thesaurus, Third Edition, n.d. Web. 2 Jan. 2018. We therefore find that defendants' release was not ambiguous, and that it explicitly referenced the risk encountered by appellant.

We now turn to appellants' claim that the release lacked conspicuity and "was without print of a size and boldness that draws the attention of an

ordinary person." (Appellants' brief at 33.) As noted above, the release appellant signed contained information regarding his season ski pass. Following the ski pass information, in a paragraph labeled "PLEASE READ THE FOLLOWING BEFORE SIGNING!![,]" defendants' release contained the exculpatory language before us for review. (Id. at 34.)

The Pennsylvania Uniform Commercial Code[8] defines "conspicuous" as "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." 13 Pa.C.S.A. § 1201(b)(10). The Code specifically states that a conspicuous term includes the following:

> (i) A heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font or color to the surrounding text of the same or lesser size.
>
> (ii) Language in the body of a record or display in larger type than the surrounding text, in contrasting type, font or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Id. at § 1201(b)(10)(i-ii) (emphasis added).

Here, the release issued by defendants and signed by appellant meets the definition of conspicuous as set forth by the Pennsylvania Uniform

---

[8] As in prior cases, we note that the Uniform Commercial Code is applicable to the sale of goods, while this case pertains to the sale of services; "nevertheless, we find the UCC's warrant disclaimer provision in Article 2, and its interpreting caselaw, provides guidance in the instant case." Beck-Hummel v. Ski Shawnee, Inc., 902 A.2d 1266, 1274 n.12 (Pa.Super. 2006).

Commercial Code. The exculpatory language of the release is preceded by a heading that is written in all capital letters in a size of text equal to the exculpatory language of the release. The heading also contains two exclamation points that call attention to the language of the heading, pursuant to the Code. Accordingly, we find that appellants' argument that the release lacked conspicuity and "was without print of a size and boldness that draws the attention of an ordinary person" is without merit, as defendants' release is conspicuous under the Pennsylvania Uniform Commercial Code.

Finally, we address appellants' averment that that there is no evidence that appellant read the release before signing it. Our cases provide that "failure to read an agreement before signing it does not render the agreement either invalid or unenforceable." Toro v. Fitness International LLC, 150 A.3d 968, 975 (Pa.Super. 2016), citing Hinkal v. Pardoe, 133 A.3d 738, 743 (Pa.Super. 2016), appeal denied, 141 A.3d 481 (Pa. 2016). See also Schillachi v. Flying Dutchman Motorcycle Club, 751 F. Supp. 1169, 1174 (E.D. Pa. 1990) ("The law in Pennsylvania is clear. One who is about to sign a contract has a duty to read that contract first"). In the instant appeal, appellant was not excused of his duty to read the Release before signing it. Therefore, appellant's argument that there is no evidence that he read the release before signing is without merit.

Gross Negligence and Reckless Conduct

Finally, appellant avers that the release does not protect defendants from liability for acts of gross negligence and/or reckless conduct. Our supreme court has held that exculpatory releases of reckless behavior are contrary to public policy, "as such releases would jeopardize the health, safety, and welfare of the people by removing any incentive for parties to adhere to minimal standards of safe conduct." Tayar v. Camelback Ski Corp., Inc., 47 A.3d 1190, 1203 (Pa. 2012), citing Hall v. Amica Mut. Ins. Co., 648 A.2d 755, 760 (Pa. 1994). Therefore, our inquiry centers on whether the conduct alleged by appellants—operating an ATV on a ski slope and creating wheel ruts on the slope—constituted gross negligence and/or reckless conduct.

This court has observed the following pertaining to gross negligence:

> In Ratti v. Wheeling Pittsburgh Steel Corp., 758 A.2d 695 (Pa.Super. 2000), appeal denied, 785 A.2d 90 (Pa. 2001), we indicated that when courts have considered the concept of "gross negligence" in various civil contexts, they have concluded uniformly that there is a substantive difference between "ordinary negligence" and "gross negligence." Id. at 703. "The general consensus finds [that] gross negligence constitutes conduct more egregious than ordinary negligence but does not rise to the level of intentional indifference to the consequences of one's acts." Id. at 704 (relying in part on bailment cases and in part on the definition of "gross negligence" as applied to the [Mental Health Procedures Act[9]]). Gross negligence may be deemed to be a lack of slight diligence or care compromising a conscious, voluntary

---

[9] 50 P.S. §§ 7101-7503.

act or omission in "reckless disregard" of a legal duty and the consequences to another party. Id. at 704-705 (citing Black's Law Dictionary 1057 (7th ed. 1999)).

In re Scheidmantel, 868 A.2d 464, 485-486 (Pa.Super. 2005).

While it is generally true that the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury, a court may take the issue from a jury, and decide the issue as a matter of law, if the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence.

Downey v. Crozer-Chester Medical Center, 817 A.2d 517, 525-526 (Pa.Super. 2003) (en banc), quoting Albright v. Abington Memorial Hospital, 696 A.2d 1159, 1164-1165 (Pa. 1997).

The Tayar court provided the following comparison of recklessness with ordinary negligence:

Recklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious inadvertence. In Fitsko v. Gaughenbaugh, 69 A.2d 76 (Pa. 1949), [our supreme court] cited with approval the Restatement ([First]) of Torts[10] definition of "reckless disregard" and its explanation of the distinction between ordinary negligence and recklessness. Specifically, the Restatement (Second) of Torts defines "reckless disregard" as follows:

The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do,

---

[10] The Restatement (Second) of Torts was published in 1965.

knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500 (1965). The Commentary to this Section emphasizes that "[recklessness] must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent." Id., cmt. a. Further, as relied on in Fitsko, the Commentary contrasts negligence and recklessness:

> Reckless misconduct differs from negligence in several important particulars. If differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. . . . The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

Id., cmt. g; see also AMJUR Negligence § 274 ("Recklessness is more than ordinary negligence and more than want of ordinary care; it is an extreme departure from ordinary care, a wanton or heedless

- 21 -

indifference to consequences, and indifference whether or not wrong is done, and an indifference to the rights of others"). Our criminal laws similarly distinguish recklessness and negligence on the basis of the consciousness of the action or inaction. See 18 Pa.C.S.A. § 302(b)(3), (4) (providing that a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk," while a person acts negligently when he "should be aware of a substantial and unjustifiable risk").

This conceptualization of recklessness as requiring conscious action or inaction not only distinguishes recklessness from ordinary negligence, but aligns it more closely with intentional conduct.

Tayar, 47 A.3d at 1200-1201.

Here, we find as a matter of law, that the record does not reflect gross negligence or reckless conduct on the part of defendants. Specifically, we agree with the trial court's following conclusion:

> [Appellants] aver that Defendants' snow-making crew created the "trenches" by operating an all-terrain-vehicle across part of the ski-slope, rather than entirely along the sides of the slopes.[Footnote 7] While apparently against normal maintenance policy and procedures and arguably negligent, we do not believe these actions amount to gross negligence or recklessness. Defendants' employees were engaged in the normal and expected process of maintaining the ski slopes and did so in a careless fashion, producing a condition that—although possibly dangerous—was not inherently unexpected upon a ski slope. We view such conduct to be a matter of ". . . mere inadvertence, incompetence, unskillfulness, or a failure to take precautions" rather than recklessness.
>
>> [Footnote 7] Defendants seemingly concede the cause of the "trenches" and Defendants' employees conceded that

> such actions were improper in normal slope maintenance process.

Trial court opinion, 5/24/17 at 8-9.

Accordingly, we find that defendants did not engage in grossly negligent or reckless conduct, and that the Release provided by defendants and signed by appellant is enforceable.

Order affirmed.


Bowes, J. joins this Opinion.

Stabile, J. concurs in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/19/2018