J-E03001-21

2022 PA Super 197

| | | |
|---|---|---|
| AISHA MONROE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CBH20, LP, D/B/A CAMELBACK SKI | : | No. 1862 EDA 2019 |
| RESORT D/B/A CAMELBACK SKI | : | |
| CORPORATION | : | |

Appeal from the Order Dated May 16, 2019
In the Court of Common Pleas of Monroe County Civil Division at No(s):
8184-CV-2016

BEFORE:  PANELLA, P.J., BENDER, P.J.E., BOWES, J., OLSON, J., STABILE, J., KUNSELMAN, J., NICHOLS, J., KING, J., and McCAFFERY, J.

DISSENTING OPINION BY BENDER, P.J.E.:  **FILED NOVEMBER 21, 2022**

I respectfully dissent.  Though I agree that Ms. Monroe waived any argument that Camelback's motion for judgment on the pleadings/motion for summary judgment was untimely or otherwise improper, unlike the Opinion *Per Curiam*, I would conclude that Ms. Monroe failed to adequately plead recklessness in her complaint.  As such, I would determine that the trial court properly entered judgment on the pleadings in favor of Camelback and correctly dismissed Ms. Monroe's claims with prejudice.  Moreover, even if judgment on the pleadings was inappropriate, I would affirm the trial court's entry of summary judgment in favor of Camelback, as I disagree that Ms. Monroe produced sufficient evidence to enable a fact-finder to conclude that Camelback acted recklessly in this matter.  I address each of these points further in turn.

**I.**

Upon examining whether Ms. Monroe adequately pleaded recklessness in her complaint, I would ascertain that she did not do so, such that Camelback's motion for judgment on the pleadings should have been granted.[1]  I recognize that an apparent split in authority as to the proper pleading of recklessness has developed, which has led to inconsistent rulings in the trial courts and understandable confusion amongst litigants.  **See** Daniel E. Cummins, *PLEADING FOR CLARITY: Appellate Guidance Needed to Settle the Issue of the Proper Pleading of Recklessness in Personal Injury Matters*, Vol. XCIII, No. 1 P.B.A. QUARTERLY 32 (Jan. 2022).  Due to this controversy, I think it useful to briefly review the current state of the law on this issue.

As the Opinion *Per Curiam* acknowledges, Pennsylvania Rule of Civil Procedure 1019 addresses the contents of pleadings and the specificity required for factual averments.  Pertinent to this matter, Rule 1019(a) provides that "[t]he material facts on which a cause of action or defense is based shall be stated in a concise and summary form."  Pa.R.Civ.P. 1019(a).  Additionally, Rule 1019(b) sets forth that "[a]verments of fraud or mistake

---

[1] I am mindful that, when ruling on a motion for judgment on the pleadings, this Court may only consider the pleadings and any documents properly attached to them.  **See Commonwealth v. All that Certain Lot or Parcel of Land Located at 4714 Morann Avenue, Houtzdale, Clearfield County**, 261 A.3d 554, 559-60 (Pa. Super. 2021); **see also** Pa.R.Civ.P. 1017(a).  Accordingly, I do not consider Mr. Wolf's expert report in my analysis, as his expert report was not attached to a pleading, but instead was produced by Ms. Monroe in opposition to Camelback's motion for judgment on the pleadings/motion for summary judgment.

shall be averred with particularity. Malice, intent, knowledge, and other conditions of mind may be averred generally." Pa.R.Civ.P. 1019(b). Thus, although Pennsylvania is a fact-pleading jurisdiction, our Rules of Civil Procedure permit parties to aver conditions of the mind generally.

Nearly fifty years ago, this Court confronted the issue of how to properly plead a condition of the mind in ***Ammlung v. City of Chester***, 302 A.2d 491 (Pa. Super. 1973). In that case, the plaintiff pleaded the following in her complaint:

> At about 11:00 p.m. on January 24, 1970, Russell G. Ammlung, Jr., an 18-year-old[] of whose estate [the] plaintiff is administratrix, was discovered out of doors in subfreezing weather, semi-clothed and only partly conscious. He was arrested by an officer of the Chester City Police Department, defendant Lawrence Platt, for being drunk and disorderly in spite of the fact that he was, and appeared to be, simply ill.
>
> Mr. Ammlung was removed to the Chester City Police Station by Officer Platt and Officers Joseph Friel and Michael Brown of the Chester Police Department, also defendants, and there confined to a cell. No medical examination was afforded him; no effort was made to ascertain his identity or to notify his relatives. He died the following morning, sometime after 10 o'clock, in his cell.
>
> In the interim, he remained in a chilled state and without adequate clothing; he was unattended until 8:45 of the morning following his arrest. A[t] some point, water was thrown upon, or otherwise applied to, him in an effort to revive [him]; the water caused him to contract pneumonia. At 8:45 of the morning following his arrest, he was observed to be still unconscious by Sergeant Paul L. Morgan of the Chester Police Department, a defendant, who heard a gurgling sound in his throat. The incident was not reported.
>
> Shortly before his death, mucus was seen coming from his mouth. ***Death resulted from the 'grossly negligent and wanton' treatment of the defendants***, who were acting within the scope of their employment and who included Captain John Welc, in

- 3 -

charge of the police station, and Roy Dixon, an employee of the police department in whose custody the decedent was while confined.

*Id.* at 493-94 (emphasis added).

The defendants filed preliminary objections in the nature of a *demurrer* to the plaintiff's complaint, which the trial court sustained. *Id.* at 492. In sustaining the defendants' preliminary objections, the trial court determined that "the defendants named in the complaint would not be liable in the absence of 'intentional, wanton, [or] malicious conduct' and that such conduct had not been sufficiently alleged." *Id.* at 494 (footnote omitted).

The plaintiff appealed, and we reversed the trial court's decision, explaining:

Under Pa.R.C[iv].P. … 1019(b), '(m)alice, intent, knowledge, and other conditions of mind may be averred generally.' Wantonness, being in principle a state of mind, has been regarded as included within the rule.[2] *The permissibility of pleading a condition of the mind generally, in a fact[-]pleading state, is, of course, founded upon necessity. The allowance of such pleading was not meant, however, to dispense with the requirement that material facts constituting the conduct of a defendant also be pleaded.*

The plaintiff has alleged that the decedent was in the custody of the defendants, that he was ill and semiconscious, that he was allowed to lie in that state a full night, without adequate clothing and without medical care, that he died the next morning in his cell, and that the defendants in so confining and treating him acted wantonly—*i.e.*, with a realization of the danger he was in and with a reckless d[i]sregard of that danger. Although it may be that the

---

[2] "'(W)antonness,' in Pennsylvania, 'exists where the danger to the (injured party), though realized, is so recklessly disregarded that, even though there be no actual intent, there is at least a willingness to inflict injury, a conscious indifference to the perpetration of the wrong.'" *Ammlung*, 302 A.2d at 497 (citation omitted).

amended complaint lacks sufficient specificity, and is thus susceptible to the motion for a more specific pleading included in [the] defendants' preliminary objections, we do not believe that a *demurrer* should have been sustained and the amended complaint dismissed.  A preliminary objection in the nature of a *demurrer* is not to be sustained and the complaint dismissed unless 'the law says with certainty that no recovery is possible.'  Under the facts alleged, we are not prepared to say that no recovery is possible.

*Id.* at 497-98 (citations and footnotes omitted; emphasis added).

Hence, following **Ammlung**, this Court has issued decisions determining that — even though conditions of mind may be pled generally — supporting factual allegations must also be pled.  **See Valentino v. Philadelphia Triathlon, LLC**, 150 A.3d 483, 489 (Pa. Super. 2016) (*en banc*), *aff'd by equally divided court*, 209 A.3d 941 (Pa. 2019) (ascertaining that the plaintiff's allegations in her complaint "averred nothing more than ordinary negligence arising from inadvertence, mistake, or error in judgment; they do not support a claim involving outrageous behavior or a conscious disregard for risks confronted by [t]riathlon participants"); **Toney v. Chester Cnty. Hosp.**, 961 A.2d 192, 203 (Pa. Super. 2008) (concluding that the complaint did not supply any factual allegations to support the legal conclusion of recklessness or intentional acts); **Cable & Assocs. Ins. Agency, Inc. v. Commercial Nat'l Bank of PA**, 875 A.2d 361, 365 (Pa. Super. 2005) ("Pennsylvania Rule of Civil Procedure 1019(b) provides that malice, intent, knowledge, and other conditions of mind may be averred generally, but this permissive pleading rule did not obviate the central requirement of our fact-pleading system, *i.e.*, that the pleader must define the issues and every act or performance essential to

that end must be set forth in the complaint.") (citations omitted); ***Waklet-Riker v. Sayre Area Educ. Ass'n***, 656 A.2d 138, 141 (Pa. Super. 1995) ("[The a]ppellant insists that bad faith is a state of mind, and thus, may be pled generally. However, her failure to plead any material facts upon which a claim of bad faith could be based is fatal to her cause of action.") (citations omitted).

Despite this line of cases, confusion about how to properly plead recklessness began to emerge following this Court's decision in ***Archibald v. Kemble***, 971 A.2d 513 (Pa. Super. 2009), *appeal denied*, 989 A.2d 914 (Pa. 2010). There, the plaintiff brought a negligence action against a fellow hockey player in his adult "no-check" ice hockey league after the fellow player allegedly checked the plaintiff in violation of the league's rules, causing injuries to the plaintiff. ***Id.*** at 515. The trial court granted summary judgment in favor of the defendant, noting that "[i]n order to recover the relief requested, recklessness or intentional conduct must be shown. Had the words 'reckless' or 'intentional conduct' even appeared within [the plaintiff's c]omplaint, [the d]efendant's position that [the plaintiff has] failed to state a cause of action for which relief can be granted would be erroneous." ***Id.*** at 517 n.1.

The plaintiff appealed. Initially, we held that the defendant must have engaged in reckless conduct to be subject to liability for the injuries sustained by the plaintiff. ***Id.*** at 517. Next, we considered whether the plaintiff was required to specifically plead recklessness in his complaint, which he had not

done, instead pleading only negligence. ***See id.*** at 515-16, 519. We explained:

> The Restatement provides:
>
>> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.[3]
>>
>> …
>>
>> Special Note: The conduct described in this Section is often called "wanton or willful misconduct" both in statutes and judicial opinions. On the other hand, this phrase is sometimes used by courts to refer to conduct intended to cause harm to another.
>
> Restatement (Second) of Torts § 500 (1965).

---

[3] As I discuss further *infra*, in addition to the lesser degree of risk involved, negligence differs from recklessness in that negligence suggests "unconscious inadvertence" or "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency[.]" ***Tayar v. Camelback Ski Corp., Inc.***, 47 A.3d 1190, 1200 (Pa. 2012); ***see also id.*** ("Recklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious inadvertence."); Pa. Suggested Standard Civil Jury Instructions 13.60 ("Reckless conduct is significantly worse than negligent conduct. The risk that harm will be caused by conduct that is reckless is higher than the risk that harm will be caused by conduct that is negligent."); Subcommittee Note to Pa. Suggested Standard Civil Jury Instructions 13.60 ("Pennsylvania decisions clearly differentiate between ordinary negligence and recklessness, not only in degree but also in kind, with the emphasis on the knowledge and intent of the perpetrator with respect to the risk of substantial physical harm.").

Recklessness, or willfulness, or wantonness refers to a degree of care Prosser describes as "aggravated negligence." Nevertheless, "[t]hey apply to conduct which is still, at essence, negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is to be treated in many respects as if it were so intended." W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS § 34 (5th ed. 1984). In this case, even though we hold [the plaintiff] must prove [the defendant] acted recklessly, the cause of action remains sounding in negligence. ***Cf. Stubbs v. Frazer***, … 454 A.2d 119 ([Pa. Super.] 1982). Therefore, merely determining the degree of care is recklessness does not give rise to a separate tort that must have been pled within the applicable statute of limitations. The trial judge was correct in ruling the degree of care is recklessness. He erred in concluding that [the plaintiff's] cause of action was not subsumed within the negligence count pled in [his] Complaint.

Pennsylvania Rule of Civil Procedure 1019(b) provides: "Malice, intent, knowledge, and other conditions of the mind may be averred generally." An example of a condition of the mind that may be averred generally is wanton conduct. ***See Ammlung***…, … 302 A.2d [at] 497 … (citations and quotation marks omitted) (explaining "[u]nder Pa.R.C[iv].P. … 1019(b), (m)alice, intent, knowledge, and other conditions of mind may be averred generally. Wantonness, being in principle a state of mind, has been regarded as included in this rule[]"). Because recklessness is also known as "wanton and willful misconduct," "recklessness" is a condition of the mind that may be averred generally.

In acknowledging the burden is recklessness, [the plaintiff's] Complaint is not being changed at all[,] let alone being changed to add new facts or new parties. [The defendant] suffers no prejudice because he is already aware of the facts. The heightened burden from simple negligence to recklessness hinders [the plaintiff], not [the defendant]. Lastly, [the defendant] is not prejudiced considering in his Answer and New Matter [he] provided: "[The defendant] was not negligent, *reckless* or careless with respect to any conduct regarding the injuries and damages alleged by [the p]laintiff…."

***Id.*** at 519-20 (footnote and citation omitted; emphasis in original).

Having concluded that the standard of care was recklessness, and that the plaintiff's negligence count subsumed his recklessness claim, we then

- 8 -

examined the record and discerned that the plaintiff had produced evidence to support each element of his cause of action. ***Id.*** at 520-21. Accordingly, we vacated the trial court's order granting summary judgment in favor of the defendant and remanded the case for further proceedings. ***Id.*** at 521.

Since ***Archibald***, it has been advanced that negligence actions encompass recklessness claims, such that recklessness and the material facts supporting a defendant's recklessness need not be pled. I disagree and, to the extent ***Archibald*** stands for this proposition, I think it should be overruled. ***See Commonwealth v. Morris***, 958 A.2d 569, 580 n.2 (Pa. Super. 2008) ("It is well-settled that this Court, sitting *en banc*, may overrule the decision of a three-judge panel of this Court.") (citation omitted).

I disagree with ***Archibald*** for the following reasons. First, ***Archibald's*** suggestion that recklessness need not be pled conflicts with Rule 1019(b). Although Rule 1019(b) allows for conditions of the mind to be averred generally, such conditions must nevertheless be averred. ***See*** Pa.R.Civ.P. 1019(b) ("Malice, intent, knowledge, and other conditions of mind may be averred generally."); ***see also Valentino***, 150 A.3d at 489 (noting that a complaint must, *inter alia*, "give the defendant notice of what the plaintiff's claim is") (citation omitted). While I do not espouse that any certain magic words must be used to plead recklessness, I do not think that it should be enough to plead only negligence and say that those allegations inherently incorporate claims of recklessness.

Second, I believe a plaintiff must plead facts supporting a defendant's reckless state of mind. As this Court declared nearly fifty years ago, "[t]he permissibility of pleading a condition of the mind generally, in a fact[-]pleading state, is, of course, founded upon necessity. The allowance of such pleading was not meant, however, to dispense with the requirement that material facts constituting the conduct of a defendant also be pleaded." *Ammlung*, 302 A.2d at 497-98 (citation and footnotes omitted). Therefore, contrary to *Archibald*, I opine that a complaint sounding only in negligence does not sufficiently plead recklessness. Instead, a plaintiff should have to supply factual allegations to support recklessness claims. *Accord Valentino*, *supra*; *Toney*, *supra*; *Cable & Assocs. Ins. Agency, Inc.*, *supra*; *Waklet-Riker*, *supra*; *Ammlung*, *supra*.

Thus, based on the foregoing, I would determine that a plaintiff must plead recklessness, and the material facts supporting a defendant's reckless state of mind, in the complaint. In my opinion, if the facts alleged do not support a claim for recklessness, the recklessness claim should not be permitted to proceed.[4]

Having reached that conclusion, I turn now to Ms. Monroe's complaint to evaluate if she sufficiently pled recklessness. Our Supreme Court has explained the difference between recklessness and negligence as follows:

---

[4] In contrast, under the Opinion *Per Curiam's* position, a plaintiff would be able to plead recklessness in **any** negligence case, regardless of the facts underlying the matter.

- 10 -

Recklessness is distinguishable from negligence on the basis that recklessness requires conscious action or inaction which creates a substantial risk of harm to others, whereas negligence suggests unconscious inadvertence. In ***Fitsko v. Gaughenbaugh***, … 69 A.2d 76 ([Pa.] 1949), we cited with approval the Restatement ([First]) of Torts definition of "reckless disregard" and its explanation of the distinction between ordinary negligence and recklessness. Specifically, the Restatement (Second) of Torts defines "reckless disregard" as follows:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500 (1965). The Commentary to this Section emphasizes that "[recklessness] must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent." ***Id.***, cmt. a. Further, as relied on in ***Fitsko***, the Commentary contrasts negligence and recklessness:

> Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man…. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

***Id.***, cmt. g; ***see also*** AMJUR Negligence § 274 ("Recklessness is more than ordinary negligence and more than want of ordinary care; it is an extreme departure from ordinary care, a wanton or heedless indifference to consequences, an indifference whether or

not wrong is done, and an indifference to the rights of others[.]"). Our criminal laws similarly distinguish recklessness and negligence on the basis of the consciousness of the action or inaction. *See* 18 Pa.C.S.[] § 302(b)(3), (4) (providing that a person acts recklessly when he "consciously disregards a substantial and unjustifiable risk," while a person acts negligently when he "should be aware of a substantial and unjustifiable risk").

This conceptualization of recklessness as requiring ***conscious*** action or inaction not only distinguishes recklessness from ordinary negligence, but aligns it more closely with intentional conduct.

***Tayar***, 47 A.3d at 1200-01 (emphasis in original).

Here, Ms. Monroe alleged that Camelback acted recklessly by: failing to properly monitor the speed of the zip-line; failing to use reasonable prudence and care by leaving her to land with no help; failing to use reasonable prudence and care to respond to her safety concerns during the zip-lining, specifically when Ms. Monroe asked Camelback to slow down the zip-lining machine; and failing to inspect and/or properly monitor the zip-lining machine's engine. ***See*** First Amended Complaint, 1/25/17, at ¶ 21(a)-(e). She also averred that Camelback's employees — "knowing that there was a high risk of injuri[es] during the landing process" — failed to assist her in those ways and that, as a result of Camelback's "consciously disregarding" her safety, she suffered injuries. ***Id.*** at ¶¶ 12, 17.

While Ms. Monroe employed the terms 'recklessness,' 'knowing,' 'high risk,' and 'consciously disregarding' in her complaint (*i.e.*, language typically associated with recklessness), the factual allegations she advanced therein do not amount to reckless conduct in my opinion. For example, she averred that, "[a]t the end of the [zip-lining] trip, [a] spotter is supposed to help customers

land safely on a square wooden platform[,]" that Camelback left her "to land with no help[,]" and that as a result of Camelback's failing to assist her, she "severely hit her legs." *Id.* at ¶¶ 11, 12, 21(b). While Ms. Monroe vaguely claimed that Camelback knew that there was a 'high risk' of injury 'during the landing process,' she did not allege that Camelback knew, or had reason to know, that it needed a spotter to help riders land or riders would face a substantial risk of injury, and that it consciously withheld such help. In addition, she did not set forth how the spotter was supposed to help her land safely on the platform, what exactly the spotter did instead, and how such lack of assistance caused her injuries. Similarly, with respect to her request to slow down the zip-line, Ms. Monroe did not allege that Camelback knew, or had reason to know, that the zip-line was going so fast as to be dangerous and consciously elected to not slow down the zip-line. Instead, Ms. Monroe simply alleged that she noticed the zip-line was going faster than it was on her first ride and that she consequently made a request that it be slowed down. Therefore, to me, the facts alleged by Ms. Monroe do not support that Camelback exhibited a reckless state of mind at the time of her injuries.

Moreover, in my view, any of Camelback's purported lapses in properly monitoring the speed of the zip-line, prudently responding to Ms. Monroe's safety concerns, and using reasonable care in helping her land safely, without more, do not establish "an extreme departure from ordinary care, a wanton or heedless indifference to consequences, an indifference whether or not wrong is done, and an indifference to the rights of others." *See Tayar*, 47

- 13 -

A.3d at 1201 (citation omitted). Instead, based on Ms. Monroe's factual allegations, I would characterize Camelback's alleged conduct as constituting "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency…." *Id.* (citation omitted). *Accord Kibler v. Blue Knob Recreation, Inc.*, 184 A.3d 974, 984-86 (Pa. Super. 2018) (concluding, on summary judgment, that the defendants did not engage in grossly negligent or reckless conduct as the defendants' employees were only careless in operating an ATV on a ski slope and creating the wheel ruts that caused the plaintiff's injuries); *see also Valentino*, 150 A.3d at 488-89 (determining that the trial court properly dismissed the plaintiff's allegations of outrageous and reckless conduct where the plaintiff alleged that a triathlon organizer "was inattentive to the needs of the contestants, failed to inspect or maintain the event course, failed to warn of or remove dangerous conditions, failed to properly plan or organize the event, failed to follow safety standards, and failed to properly train and supervise its employees"). Indeed, Ms. Monroe herself claims that Camelback's "negligence" — not recklessness — was "the proximate and sole cause of the injuries and damages to [her]…." First Amended Complaint at ¶ 22. Accordingly, I would determine that Ms. Monroe failed to plead recklessness and affirm the trial court's order granting Camelback's motion for judgment on the pleadings.

## II.

Even if I had ascertained that judgment on the pleadings was improper, I would affirm the trial court's entry of summary judgment in favor of Camelback. With respect to the trial court's grant of summary judgment in favor of Camelback, Ms. Monroe argues that the trial court erred in finding that Mr. Wolf's expert report was impermissible because it was not properly attached to her response to Camelback's motion for summary judgment. **See** Ms. Monroe's Brief at 28-29. Interestingly, while she insists that the trial court should have considered Mr. Wolf's expert report, she includes no discussion of the content of Mr. Wolf's expert report in her appellate brief. Instead, Ms. Monroe argues that the record supports a finding of recklessness because:

> [Ms.] Monroe was below the weight limit for the zip-line. The zip-line was known to bob up and down for heavier people.
>
> [Ms.] Monroe requested the zip-line engine be slowed down by the first spotter.
>
> The second spotter abandoned that spotter's job duty to help [Ms.] Monroe land safely.
>
> Thereafter[, Ms.] Monroe land[ed] unsafely and suffered severe injury.
>
> [Ms.] Monroe was refused medical attention — the employee ran off. **See[] Morningstar v. Hoban**, 55 Pa.D[.]& C[.] 4th 225 ([Allegheny Cty.] 2002) (post-accident callousness warranting punitive damages as reckless).
>
> The operative Complaint (*e.g.*, Motion for Judgment on the Pleadings), all record facts (*e.g.*, Motion for Summary Judgment), in the light most favorable to [Ms.] Monroe (*i.e.*, the operative standard), finds [Ms.] Monroe presented (a simple case of) [Camelback's] recklessness. **Rubin v. CBS Broadcasting, Inc.**, 170 A.3d 560, 564 (Pa. Super. 2017) (citing Pa.R.C[iv].P. 1034); **Com. by Shapiro[ v. Golden Gate Nat'l Senior Care LLC**, 194 A.3d 1010, 1030 (Pa. 2018)] (citing **Yac[o]ub [v. Lehigh Valley**

> *Med. Assocs., P.C.*, 805 A.2d 579, 589 (Pa. Super. 2002) (*en banc*)]); Pa.R.C[iv].P. 1034 & 1035.
>
> Even if not factually simple (*i.e.*, not requiring an expert), [Ms.] Monroe supplied a trial court-directed expert: further amplifying her recklessness claim.
>
> The complaint merged with the record facts — which the trial court originally held recklessness an issue of fact for the jury. *See generally*[] *Sullivan v. City of Phila.*, 460 A.2d 1191, 1192 (Pa. Super. 1983) (citing Pa.R.C[iv].P. 1033)); *see*[] *Bloom v. Dubois v. Reg'l Med. Ctr.*, 597 A.2d 671, 677 n.7 (Pa. Super. 1991).
>
> Both the pleadings and the record evidence evidenced an issue of fact of recklessness for the jury — as was held upon the original dispositive motion (denied by the Court of Common Pleas).
>
> The trial court committed an error of law in granting [Camelback's] renewed dispositive motion.

Ms. Monroe's Brief at 30-31.

Examining the arguments advanced by Ms. Monroe, both on appeal and before the trial court, I would determine that the trial court did not err in granting summary judgment in favor of Camelback. Assuming *arguendo* that the trial court should have considered Mr. Wolf's expert report and other exhibits, Ms. Monroe does not discuss any of the substance of his report, explaining how it establishes Camelback's recklessness and connects to her injuries, in her appellate brief. *See Commonwealth v. Hardy*, 918 A.2d 766, 771 (Pa. Super. 2007) ("[I]t is an appellant's duty to present arguments that are sufficiently developed for our review. … This Court will not act as counsel and will not develop arguments on behalf of an appellant.") (citations omitted).

Further, in my view, even upon looking back in the record, the arguments Ms. Monroe made to the trial court with respect to Mr. Wolf's report also do not establish Camelback's recklessness in this matter. There, Ms. Monroe claimed, in relevant part, that:

[Ms. Monroe] was injured on her second run down the zip[-]line. ***See*** Exhibit B, 37:1-37:6. On the second run, [Ms. Monroe] attempted to sufficiently pick-up her feet, but was unable to do so due to her weight. ***See*** Exhibit C, 15:18-15:24. [Ms. Monroe's] body impacted the landing deck twice. ***See*** Exhibit C, 11:14-11:19.

The first impact occurred when [Ms. Monroe's] feet impacted the mats/carpets that were placed in front of the landing deck to conceal the front face of the landing deck. ***See*** Exhibit C, 11:7-11:13. ***See also*** Exhibit D (photograph). ***See also*** Exhibit A. [Ms. Monroe's] body swung and spun, due to the first impact, when [Ms. Monroe] then impacted the landing deck a second time, resulting in significant physical injuries. ***See*** Exhibit C, 11:4-11:13.

[Camelback] is aware of the potential harm to a customer due to impacting the front of the landing deck. [Camelback] placed a sign, stating "Lift your fee[t]" at the bottom of the zip[-]line. ***See*** Exhibit C, 26:17-26:18. [Camelback] also instructs its employees to yell "Pick up your feet" as the customer is speeding down the zip-line. ***See*** Exhibit C, 15:4-15:5. ***See also*** Exhibit E, 17:22-18:1.

Further, [Camelback] is aware that a customer can impact the face of the landing deck, which protrudes above ground level significantly. In fact, [Camelback] placed mats/carpets on the front face of the landing deck. ***See*** Exhibit D (photograph). However, [Camelback] admitted that the mats are not designed to prevent injury from a customer['s] hitting the face of the landing deck. ***See*** Exhibit F, 17:2-17:5. Finally, [Camelback] is aware that customers may not be able to lift their feet. ***See*** Exhibit C, 16:1-16:5.

[Ms. Monroe] has produced an expert report, authored by Steve Wolf. ***See*** Exhibit A. Expert Wolf has built and operated numerous private, industrial, and commercial zip[-]lines and, in

fact, owns a recreational park that operates three zip[-]lines. *Id.* at 1.

Expert Wolf explained that a zip[-]line is constructed with the intention that no part of the rider is to collide with any hard surface until the rider comes to a stop at the bottom of the zip[-]line. *Id.* at 2. In fact, this is in line with [Camelback's] agent's testimony that the rider should come to a complete stop, after which the zip[-]line attendant walks the rider up the ramp to a point in which the zip[-]line attendant can unhook the rider from the zip[-]line. *See* Exhibit F, 51:22-54:24. However, the landing platform at Camelback had a face that "protrudes sharply and vertically from the ground around it, at a 90[-]degree angle to the ground"; making the landing deck "perfectly positioned to cause an injury[."] *See* Exhibit A, at 4.

Expert Wolf explained that:

> Given that contact with the ground prior to reaching the end of the zip[-]line was likely to create injury, the solution to that problem should have been an engineered solution, rather than a solution requiring instruction and active compliance…. It's not reasonable to base a participant's safety on having them be able to perform a physical feat such as raising their legs, or to be able to reliably listen to and follow directions when in a heightened state of arousal from experiencing an adrenaline[-]rich experience, *especially* in cases where an engineered solution could have easily been implemented.

> An engineered solution takes the ability to cause an accident, by virtue of an inability to execute a command, away from the rider, and builds the safety into the equipment.

*Id.* at 3-4. [Camelback] could have engineered a solution simply by lowering the face of the landing deck to ground level or filling in the gap between the ground and the face of the landing deck with an aggregate material (dirt, sand, *etc*[.]). *Id.* at 4.

In fact, Expert Wolf determined that [Camelback] intentionally concealed the risk. Expert Wolf explained that:

> This must have been noted by one or more members of the Camelback staff, because the condition was "remedied" by covering the protrusion with a piece of carpeting. But the

> carpeting, being supple, conformed to the shape of the underlying danger, rather than fixing it. It concealed, rather than removed, the risk.
>
> ***Id.*** Expert Wolf opined that [Camelback] recklessly ignored the gross risks as a result of the face of the landing deck protruding above ground level and actually attempted to conceal the risk by placing a soft mat/carpet over the face of the landing. ***Id.*** at 5. ***See also*** Exhibit D (photograph).

Ms. Monroe's Memorandum of Law in Response to Camelback's Motion for Judgment on the Pleadings/Supplemental Motion for Summary Judgment, 5/16/19, at 2-4 (unnumbered pages; emphasis in original).

Relying on Mr. Wolf's expert report, Ms. Monroe argued that, "[h]ad [Camelback] taken a reasonable course of conduct in addressing the risk of riders impacting the face of the landing pad, [she] would not have been injured." ***Id.*** at 9 (unnumbered pages; citation omitted). However, to support that her initial impact with the face of the landing deck caused her injuries, Ms. Monroe advanced the following argument:

> [Ms. Monroe's] body impacted the landing deck twice. ***See*** Exhibit C, 11:14-11:19.
>
> The first impact occurred when [Ms. Monroe's] feet impacted the mats/carpets that were placed in front of the landing deck to conceal the front face of the landing deck. ***See*** Exhibit C, 11:7-11:13. ***See also*** Exhibit D (photograph). ***See also*** Exhibit A. ***[Ms. Monroe's] body swung and spun, due to the first impact, when [Ms. Monroe] then impacted the landing deck a second time, resulting in significant physical injuries.*** ***See*** Exhibit C, 11:4-11:13.

Ms. Monroe's Memorandum of Law in Response to Camelback's Motion for Judgment on the Pleadings/Supplemental Motion for Summary Judgment at 2 (unnumbered pages; emphasis added).

- 19 -

The portion of Exhibit C referenced by Ms. Monroe in her above-stated argument sets forth the deposition testimony of Brett Dunphy, a former Camelback employee who was working on the day of Ms. Monroe's accident, describing how she hit her feet. Mr. Dunphy testified:

> [Ms. Monroe's counsel:] Okay. Do you actually remember seeing [Ms.] Monroe hit her feet in some way?
>
> [Mr. Dunphy:] When she landed. That was it. Only when she landed. And -- only when she landed really.
>
> [Ms. Monroe's counsel:] I understand -- I have seen your statement. Can you just describe how [Ms. Monroe's] feet impacted whatever they hit?
>
> [Mr. Dunphy:] So, first, they kind of dragged against the anti-fatigue mats.[5] You saw that there. And then the impact really came when she stopped and she swung up and when she actually, like, hit the deck to land. Like, the actual landing part -- that's when her -- whatever it was broke.
>
> [Ms. Monroe's counsel:] Okay. … I am glad you said that because that's what I am going to want you to clarify. So[,] there were two impacts. So, you are saying it was the second impact that was the rough impact?
>
> [Mr. Dunphy:] Yes.

**See** Dep. of Dunphy at 10:23-11:19.

Despite Ms. Monroe's assertion, this testimony does not establish that her initial impact with the landing deck's mats caused her body to swing and spin, leading to the second impact where she says she sustained her injuries.

---

[5] Mr. Dunphy described the anti-fatigue mat as "a mat that … you would just walk on, kind of. It's mats at the bottom of the zip[-]line that we would pretty much just walk on." **See** Ms. Monroe's Response to Camelback's Motion for Judgment on the Pleadings/Supplemental Motion for Summary Judgment, 5/16/19, at Exhibit C ("Dep. of Dunphy") at 19:8-19:11.

Instead, Mr. Dunphy said that her injuries occurred when she came to a stop, swung upward, and tried to land.[6] Further, Mr. Dunphy testified that, upon braking at the end of the trip, every zip-line rider proceeds forward and pendulums up to a certain degree, and that he did not know if Ms. Monroe's dragging her feet on the mats would be a factor in causing her to pivot up at the end of the zip-line. Dep. of Dunphy at 30:1-31:1. Thus, Mr. Dunphy's testimony does not establish to me that Ms. Monroe's impact with the mats on the front face of the landing deck caused her body to swing and spin, or otherwise led to the second impact that she says resulted in her injuries.

Moreover, my review of the record shows that Ms. Monroe herself denied at her deposition ever hitting the front face of the landing deck or otherwise dragging her feet. There, she testified:

[Camelback's attorney:] [Y]ou come to the end [of the zip-line] and stop, and now you're pushed backwards a little bit?

[Ms. Monroe:] Yes.

[Camelback's attorney:] Is that what happened?

[Ms. Monroe:] Yes.

[Camelback's attorney:] Before that point, had you hit your foot or struck your foot or done anything with your foot as you were coming in?

[Ms. Monroe:] No.

[Camelback's attorney:] Okay.

---

[6] *See also* Ms. Monroe's Brief at 18 (stating that Mr. Dunphy "testified that the incident occurred because the zip-line lifted up and slammed [Ms. Monroe] back to the ground (which broke her leg)") (citation omitted).

[Ms. Monroe:] The gentleman did tell me to lift my legs up at the beginning of it and I [did] that.  I was holding them up.

[Camelback's attorney:] Okay.  So[,] I don't want to jump ahead, but after you landed and -- we call it "landed" when you come into the bottom, and you come backwards a little bit, does your body pivot and your foot go up in the air, or does it go down and strike the platform?  …

[Ms. Monroe:] … It [spun] around, and I thought I was going back, so my leg dropped, and I just felt a crunch.  I can't remember if it was still moving back and forth or what happened.  I just know it [spun] around and I felt my leg crunch when it landed.

[Camelback's attorney:] And when you say[,] "it landed," it landed on the top of the deck?

[Ms. Monroe:] Yes.

***

[Camelback's attorney:] Do you recall as you were coming down dragging your foot along the ground at any point in time before you were on the deck?

[Ms. Monroe:] I had both my legs up.  I was holding them up.  I made sure of that.

***

[Camelback's attorney:] Okay.  … I'm trying to … picture in my mind, since I wasn't there.  Did your leg go in an up[-]and[-]down motion and strike the deck, or did it catch the deck?  What's your recollection of how that contact was made?

[Ms. Monroe:] I came down with my legs up, and when I spoke to the gentleman and he said, "It's almost over," it came down and jerked up and I [spun] back around and came back down, and the force of me coming down, my leg was broken.  I heard the crunch.

*See* Ms. Monroe's Response to Camelback's Motion for Judgment on the Pleadings/Supplemental Motion for Summary Judgment at Exhibit B ("Dep. of Monroe") at 52:8-53:20, 54:14-54:20, 84:8-84:22.[7]

Finally, Michael Baldaccini, another Camelback employee working on the day of the incident, testified:

> [Ms. Monroe's attorney:] Okay. All right. Now, [Ms. Monroe and her companion] were both coming down, and just if you remember, tell me what happened.
>
> [Mr. Baldaccini:] We were instructing them to lift their legs verbally and physically, which they did, so they followed our instructions. The braking system caught them, just like it always does. There was no visible malfunction with that whatsoever.
>
> The braking system caught them, and it's up to the customer to land on their feet when they get to the bottom, which we instruct them at the top of the zip-line, we show them physically how to land on their feet.

---

[7] In Ms. Monroe's medical records, there are also various descriptions of how her injuries occurred, none of which mention that her initial impact with the front face of the landing deck caused her second impact with the landing deck. *See* Ms. Monroe's Response in Opposition to Camelback's First Motion for Summary Judgment, 3/12/18, at Exhibit B at 9 (stating that Ms. Monroe "was out zip[-]lining with her husband when she failed to break [*sic*] the line prior to arrival at a station within the trees and struck her leg up against the landing platform where she was noted to have suffered a significant injury…"); *id.* at 36 (providing that Ms. Monroe "did not break [*sic*] the zip[-]line in time and she was tossed around at the end of the cord with her extremities moving quite violently in multiple different directions. She states that during this time frame and that [*sic*] her right foot struck the platform while she was being whipped around"); *id.* at 40 ("According to EMS, [Ms. Monroe] was coming to the end of the [zip-]line when she didn't get her right leg up high enough and hit it against a board."); *id.* at 140 ("The patient was on a zip[-]line. She had difficulty at the end when she went back and forth and[,] at some point[,] she had her right leg caught. It was twisted and she felt a snap.").

She landed on her feet. I guess she must have landed awkwardly, because everything seemed to be normal when they came down and when they landed.

So[,] there was no malfunction from the employee's standpoint, there was no malfunction of the braking system, the customer[s] seemed to be pretty coherent with what we were saying to them, they followed our instructions of lifting their legs and preparing to be stopped by our braking system.

[Ms. Monroe's attorney:] So what happened, though?

[Mr. Baldaccini:] Braking system caught her, she landed on her feet just like she's supposed to, and apparently she injured her leg, which I'm not sure how she did it.

\*\*\*

[Camelback's attorney:] So[,] let me read this typewritten statement [you gave with respect to this incident], and I'll read it slowly and then … I will have a couple questions about it.

It says, [a]t approximately 5:05 p.m., at the bottom deck of the 1,000-foot zip-line, a guest on our left zip-line cable, which we call lodge side, came in contact with our braking system, period.

Did this accident happen on the 1,000-foot zip-line?

[Mr. Baldaccini:] Yes.

[Camelback's attorney:] Okay. Let me continue on. As she did that, her left foot slightly hit the beginning of our bottom deck. When this occurred, her shoe came off.

Do you recall that or does that refresh your --

[Mr. Baldaccini:] Seeing it --

[Camelback's attorney:] Well, let me ask you --

[Mr. Baldaccini:] Seeing it myself, no. That's I was told [*sic*].

[Camelback's attorney:] Does that refresh your recollection at to this incident?

[Mr. Baldaccini:] If I know what incident we're talking about, yes.

[Camelback's attorney:] Okay. When this happened, our braking system did its normal procedure of braking and she swung up approximately three feet in a pendulum motion.

Do you recall seeing that?

[Mr. Baldaccini:] No.

[Camelback's attorney:] Okay.

[Mr. Baldaccini:] That is normal procedure, though.

*See* Ms. Monroe's Response in Opposition to Camelback's First Motion for Summary Judgment at Exhibit C ("Dep. of Baldaccini") at 22:23-24:2, 32:24-34:7.

To me, none of the above-stated evidence supports Ms. Monroe's claim that her initial contact with the mats or the front face of the landing deck caused her to swing and spin, leading her to impact the landing deck a second time, sustaining injuries. Rather, even if Ms. Monroe's feet dragged on the mats or slightly hit the bottom of the landing deck, the deposition testimony of witnesses to the incident — including Ms. Monroe's own testimony — indicates that she was injured after the zip-line came to a stop at the end of the trip, at which point she swung and tried unsuccessfully to land on her feet. Moreover, Ms. Monroe proffered no evidence to suggest that her initial contact with the mats or landing deck caused her to swing more upon stopping, land with greater force, *etc*. Thus, based on the argument advanced by Ms. Monroe below, the evidence she cited in support, and my own review of the record, I discern no connection between Ms. Monroe's initial contact with the mats on the front face of the landing deck and her subsequent injuries that she said she sustained from her second impact with the landing deck.

Consequently, even if Mr. Wolf's report should have been considered, I do not see a factual basis for Mr. Wolf's opinion that "[t]he injuries sustained by Ms. Monroe are attributable directly to [the] failure of Camelback to act to prevent injury, and the intentional disregard for safety taken by Camelback in [its] decision to conceal rather than to remove an obvious threat to the safety of their trusting clients."  Ms. Monroe's Memorandum of Law in Response to Camelback's Motion for Judgment on the Pleadings/Supplemental Motion for Summary Judgment at 8 (quoting Mr. Wolf's expert report) (unnumbered pages); *see also id.* at 9 (arguing that "the record is sufficient to support a jury finding that [Camelback's] reckless course of conduct in attempting to make the zip[-]line safe for riders caused [Ms.] Monroe's injuries.  Had [Camelback] taken a reasonable course of conduct in addressing the risk to riders impacting the face of the landing pad, [she] would not have been injured") (citations omitted; unnumbered pages).  As such, and contrary to the Opinion *Per Curiam's* conclusion, I do not think Mr. Wolf's report would help Ms. Monroe establish Camelback's recklessness in this matter, as she has not shown that her initial contact with the front face of the landing deck led to her second impact with the landing deck, which she explicitly claimed caused her injuries below.

Finally, in my view, the actual argument Ms. Monroe advances on appeal as to why the record supports a finding of recklessness also fails.  *See* pages 15-16, *supra* (setting forth Ms. Monroe's argument).  Initially, Ms. Monroe provides no citations to the record for many of the factual assertions in her

argument. *See* Ms. Monroe's Brief at 30-31; *see also* Pa.R.A.P. 2119(c) ("If reference is made to the pleadings, evidence, charge, opinion or order, or any other matter appearing in the record, the argument must set forth, in immediate connection therewith, or in a footnote thereto, a reference to the place in the record where the matter referred to appears…."); Pa.R.Civ.P. 1035.3(a)(2) ("[T]he adverse party may not rest upon the mere allegations or denials of the pleadings but must file a response within thirty days after service of the motion identifying … evidence in the record establishing the facts essential to the cause of action or defense which the motion cites as not having been produced."); *Milby v. Pote*, 189 A.3d 1065, 1079 (Pa. Super. 2018) ("We shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument….") (citation omitted).

Even more troublesome, though, Ms. Monroe does not meaningfully discuss authority pertaining to what constitutes reckless conduct, and how the purported facts on which she relies establish Camelback's recklessness in connection to her injuries. *See Coulter v. Ramsden*, 94 A.3d 1080, 1088 (Pa. Super. 2014) ("We need not reach the merits of this issue because the argument section of [the a]ppellant's brief merely consists of general statements unsupported by any discussion and analysis of relevant legal authority."); *In re R.D.*, 44 A.3d 657, 674 (Pa. Super. 2012) ("[I]t is an appellant's duty to present arguments that are sufficiently developed for our review. The brief must support the claims with pertinent discussion, with references to the record and with citations to legal authorities.") (citation

omitted).  Unlike the Opinion *Per Curiam*, I would decline to do such work for her.  ***See Commonwealth v. Williams***, 782 A.2d 517, 532 (Pa. 2001) (Castille, J., concurring) ("This Court is neither obliged, nor even particularly equipped, to develop an argument for a party.  To do so places the Court in the conflicting roles of advocate and neutral arbiter.  … The practice of fashioning arguments for a party is also unfair to the would-be responding party, which will only learn upon receipt of the Opinion that the Court perceived the argument, and thus will have been deprived of an opportunity to respond.").[8]

_____

[8] Moreover, even if not waived for failure to develop an argument on appeal, I would deem meritless the argument concerning the weight limit that Ms. Monroe advanced below in opposition to Camelback's first motion for summary judgment.  There, she contended that Camelback "knew there was a dangerous condition for heavy people on the zip[-]line, and knowingly ignored that condition.  Specifically, the weight limit was not low enough.  There was a known risk that the line would be rippling up and down for heavy people, so that when [Ms. Monroe] approached the end of the line[, she] would not be able to lift her feet high enough to avoid injury."  ***See*** Ms. Monroe's Memorandum of Law in Opposition to Camelback's First Motion for Summary Judgment, 3/12/18, at 9 (unnumbered pages).  I would reject this argument.  First, as I have discussed *supra*, Ms. Monroe has not established that her feet's initial contact with the front face of the landing deck led to her second impact with the landing deck, which she claimed caused her injuries.  Second, while Ms. Monroe averred that Camelback was reckless because Mr. Dunphy and Mr. Baldaccini knew that the zip-line regularly rippled and/or swung up for heavy people, posing a serious danger, my review of the record belies that assertion.  ***See*** Dep. of Dunphy at 23:18-25:24 (Mr. Dunphy's stating that the zip-line did not regularly swing up for heavy people, but would regularly swing up for someone ***over*** the weight limit of 265 pounds); ***id.*** at 12:10-13:2, 23:10-23:17 (Mr. Dunphy's testifying that he only saw one other person get injured on the zip-line, and that injury took place a year ***after*** Ms. Monroe's incident); ***id.*** at 23:1-23:4 (Mr. Dunphy's recounting how surprised he was
*(Footnote Continued Next Page)*

Thus, even if judgment on the pleadings was improper, I would affirm the trial court's entry of summary judgment in favor of Camelback. It is well-established that the "[f]ailure of a non-moving party to adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof … establishes the entitlement of the moving party to judgment as a matter of law." *See Finder v. Crawford*, 167 A.3d 40, 45 (Pa. Super. 2017) (citation omitted). Here, in my opinion, Ms. Monroe failed to demonstrate that Camelback acted recklessly in this matter, and therefore Camelback would be entitled to judgment as a matter of law. Accordingly, I dissent.

---

about Ms. Monroe's incident); Dep. of Baldaccini at 26:13-28:9 (Mr. Baldaccini's acknowledging that there can be a "ripple effect" from a heavy person going down the zip-line, but explaining that he has never seen anyone sustain injuries from the zip-line's "ripple effect" or be injured in the same way as Ms. Monroe); *see also* Ms. Monroe's Response to Camelback's Motion for Judgment on the Pleadings/Supplemental Motion for Summary Judgment at Exhibit E ("Dep. of Susan Wiley") at 13:14-15:16 (Ms. Wiley's — a Camelback employee — stating that she has never observed anyone else get injured on the zip-line in a way similar to Ms. Monroe); Ms. Monroe's Response to Camelback's Motion for Judgment on the Pleadings/Supplemental Motion for Summary Judgment at Exhibit F ("Dep. of Clinton Frantz") at 33:20-34:3 (Mr. Frantz's — a Camelback employee — testifying that he is aware of no other injuries on the zip-line other than Ms. Monroe's injuries). Further, if Camelback did not actually know of the danger posed to heavy people by the rippling/swinging, Ms. Monroe did not develop an argument as to why Camelback had reason to know that the rippling/swinging created a substantial risk of harm. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal."). Thus, I would be unconvinced by Ms. Monroe's argument that Camelback knew that the rippling or swinging created a dangerous condition for heavy people, and that Camelback knowingly ignored that condition. *See Kibler*, 184 A.3d at 984-86 (determining, as a matter of law, that the record does not reflect gross negligence or reckless conduct on the part of the defendants, and affirming the entry of summary judgment in the defendants' favor).

Judge Olson Joins.

Judge Stabile Concurs in the Result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>11/21/2022</u>