J-A27038-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| FREDERICK T. FRY, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF JEAN ANN FRY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| Appellant | : | |
| v. | : | |
| | : | No. 50 MDA 2022 |
| MONTROSE MINUTE MEN, INC. | : | |

Appeal from the Order Entered December 8, 2021
In the Court of Common Pleas of Susquehanna County
Civil Division at No(s):  2020-00487

BEFORE:   DUBOW, J., McLAUGHLIN, J., and COLINS, J.*

MEMORANDUM BY COLINS, J.:          **FILED: JULY 28, 2023**

Frederick T. Fry, individually and as administrator of the estate of Jean Ann Fry, appeals from the order granting summary judgment in favor of Montrose Minute Men, Inc. ("Minute Men"). On appeal, Fry presents seven issues, all of which touch upon his underlying contention that the lower court erred in its summary judgment determination. After an extensive review of the record, we disagree and affirm.

As background,

[o]n January 15, 2019, the ["]Minute Men crew["] was dispatched to the Fry residence for a complaint of dizziness which required lifting assistance. The crew arrived about a half hour after [Jean Ann Fry, the] [d]ecedent fell. The crew consisted of Shawn Frampton, a paramedic, and Amy Johnson, the emergency

---

* Retired Senior Judge assigned to the Superior Court.

medical technician (EMT). Decedent was still on the floor in the kitchen when Frampton and Johnson entered the house. Decedent was conscious, alert, and oriented and reported no neck pain or dizziness to Frampton. Frampton palpated [d]ecedent's neck and back before lifting her. Fry pulled a dining room chair over and Frampton and Johnson lifted [d]ecedent onto the chair. Decedent refused to be transported to the hospital so Frampton sent Johnson out to the ambulance to bring in refusal paperwork and a heart monitor. A minute later, [d]ecedent's eyes rolled back in her head and she became semi-responsive and then unresponsive. Frampton felt for a pulse and when he found no pulse, he moved her to the floor and started CPR on [d]ecedent. Johnson came back into the house and Frampton sent her back out to the ambulance to call for assistance because [d]ecedent was in cardiac arrest. A second crew from the Minute Men was dispatched. Johnson came back into the residence with equipment and helped Frampton with compressions. Frampton tried to start an intravenous line (IV) but was unsuccessful. He then successfully placed an intraosseous device (IO) in order to administer epinephrine to [d]ecedent. Two members of the Hop Bottom Hose Company were dispatched and arrived eight minutes later. The additional dispatched members of the Montrose Minute Men arrived, including James Krupinski and Robert Getz, and assisted with CPR then helped moved [d]ecedent to a backboard to transfer her to the ambulance. In the ambulance, Frampton and Getz continued performing CPR and Frampton administered additional doses of [e]pinephrine. Frampton tried to intubate [d]ecedent but there was [a] "peanut butter" like substance in her airway which he tried to suction out. He was unsuccessful. They arrived at the hospital and CPR was continued. Decedent was pronounced dead approximately 15 minutes later.

Fry stated that Frampton and Johnson arrived to his residence about a half hour after [d]ecedent fell. Decedent was still on the floor in the kitchen and Fry brought a chair from the dining room into the kitchen and Frampton and Johnson lifted [d]ecedent into the chair. Decedent said she did not want to go to the hospital and Frampton informed Fry that they could not make her go to the hospital. Decedent started to slur her words and went unconscious. Decedent was moved from the chair to the floor and Frampton started performing chest compressions. Johnson was sent outside. A second crew arrived. They took [d]ecedent to the hospital and Fry followed in his own vehicle. At the hospital, Fry was told that [d]ecedent had died. Fry called the coroner after

he received the death certificate because the coroner did not list the cause of death as an accident. Fry asked the coroner to change the death certificate because Fry believed [d]ecedent's fall was the cause of her death.

Frampton ha[d] 20 years' experience as a paramedic. The Fry call came in at 9:39 p.m. as an "Alpha" or low priority call, and he and Johnson were dispatched at 9:44 p.m. Frampton agreed that protocols apply to all emergency medical service (EMS) calls and if you do not follow protocol and obtain a history or perform a physical examination, you do not know how to treat the patient. He agreed that the physical exam is documented. Initial treatment for cardiac arrest is CPR. Frampton agreed that he did not have a cardiac monitor or equipment to place an IV at the time of the cardiac arrest. Frampton also agreed that for cardiac arrest, per protocol, epinephrine is generally given every three to five minutes. He agreed that the documentation indicates that he gave epinephrine at ten-minute intervals. It took him 12 minutes to administer the first dose of epinephrine because he was performing CPR and trying to initiate the unsuccessful IV and subsequent successful IO. He did not call medical command because there is no cell phone coverage or sufficient radio coverage in Hop Bottom where the Fry residence is located. Frampton conceded that he did not try to use his phone but from past experience, he knows there is no cell coverage in that area.

Johnson explained that on January 15, 2019, she was an EMT for the Minute Men who was paid a $20 stipend to do a shift which covered her fuel and meal cost. She explained that cardiac arrest was a high priority condition and protocol indicates administration of oxygen, treatment and immediate transport to [an] appropriate medical facility. Performance of a focused, head-to-toe, physical exam is [necessary] and that exam should be documented unless it is trumped by something else. If the patient goes into cardiac arrest, that becomes the focus.

Robert Getz explained that he was a paid EMT for the Minute Men but at the time of the incident on January 15, 2019, he was responding as a volunteer because it was an off-duty or a second duty call.

James Krupinski has been an EMT since 1986. He was operations manager for the Minute Men on January 15, 2019. He ran the day-to-day operations and was responsible for payroll,

taxes and bills and he did the hiring and firing of personnel. The Minute Men has a combination of paid employees and volunteers. The Minute Men does in-house training of EMTs outside of the required continuing education credits. The training is available through the regional office and could be two to six times a year. The Minute Men have policies and procedures that the EMTs and paramedics are expected to follow for documentation and patient care and all EMTs must follow the statewide basic life support (BLS) protocols and paramedics must follow the statewide advanced life support (ALS) protocols. Krupinski does not know if medical command was contacted at the time of the Fry call. Contact is usually made by cellphone but there is no cellphone coverage in Hop Bottom and radio coverage is uncertain in certain areas of Susquehanna County.

Fry provided the report of Kimberly D. Freeman who is a physician[,] board-certified in emergency medicine and emergency medical services. Dr. Freeman indicated that [d]ecedent had a history of hypertension, atrial fibrillation and had a breast biopsy the day before the incident. Following [d]ecedent's death, no autopsy was performed and the cause of death was listed as myocardial infraction, atrial fibrillation and hypertension. She believed that Frampton and Johnson breached the standard of care which caused and/or increased the risk of death of [d]ecedent in the following ways: 1) Frampton moved [d]ecedent to a chair without a documented medical exam; 2) Frampton did not document use of a "pit crew" for CPR after additional crew members arrived; 3) Frampton and Johnson did not bring equipment into the Fry home which delayed optimal initiation of resuscitation; 4) [r]hythm and pulse checks every two minutes were not documented; 5) Frampton attempted an IV as [a] first attempt for vascular access rather than [a] tibial IO which is required per ALS protocol; 6) ETCO2 was not observed/documented as required by ALS protocol; 7) consideration/documentation of reversible causes of cardiac arrest was not done; 8) epinephrine was administered at 10 minute intervals when ALS protocol calls for administration every 3-5 minutes; 9) airway placement times were not documented and a secondary/rescue airway option was not considered following failed attempts to intubate; 10) reasons for deviation from protocol were not documented as required; and 11) there was a failure to contact medical command as required before transport and/or when 20-40 minutes of ALS unsuccessful resuscitative efforts had been completed. Dr. Freeman offered the

- 4 -

following opinion:

> [Decedent] suffered a cardiac arrest in the presence of Paramedic Frampton and EMT Johnson of the Montrose Minute Men when they responded to her residence for a fall. The resuscitation that ensued was compromised by the fact that the equipment was not brought into the house, delaying optimal resuscitation due to the lack of rescuers at her side and the lack of equipment to perform resuscitation. Thereafter, the wrong initial vascular access was used, the wrong epinephrine dosing interval was used, pulse and rhythm checkers were not performed every two minutes, and reversible causes were not considered. In addition, airway management by unsuccessful intubation attempts required CPR interruption rather than using a rescue device, and airway management was not documented adequately. Finally, ETCO2 was never documented and Medical Command was not contacted before transport as is required by protocol. … In conclusion, within a reasonable degree of medical certainty, all of the foregoing deviated from the standard of care in EMS care and increased the risk of harm and ultimately death of [decedent].

Fry also provided the report of William G. McDonald, PhD, FACPE, NR-Paramedic. McDonald believed that the following actions were outside of the standard of care: 1) the crew failed to bring in diagnostic or treatment equipment when responding to a call for possible fainting; 2) [d]ecedent was placed in a chair prior to performance of an initial assessment; 3) rhythm checks were not performed every two minutes per protocol; 4) CPR pit crew approach was not documented; 5) Frampton attempted an IV line before attempting an IO when protocol directs to attempt an IO first; 6) while several attempts as endotracheal intubation were documented, Frampton did not document any attempt to remove the peanut butter in the airway manually or with finger sweeps; 7) Frampton did not document the use or attempted use of an alternative airway device; 8) Frampton failed to administer epinephrine every 3-5 minutes as directed in Protocol 3031A; 9) Frampton did not document any attempt to call medical command either by radio or phone prior to moving or transporting the patient. McDonald then offered the following opinion:

> The EMS crew from the Montrose Minute Men should have initially carried their equipment with them into the Fry

home regardless of the call type. In this case, the call type (per the CAD) was fainting. This should have prompted the crew to think about possible medical conditions that could have possibly taken place. If the crew carried the equipment in and performed a thorough initial assessment, (checking the airway, breathing and circulations) initial vital signs, an EKG, SPO2 reading, and blood glucose level they would have determined whether [decedent] was stable enough to be moved into a sitting position in a chair. Once [decedent] suffered the cardiac arrest, she was place[d] on the floor. CPR was initiated, however, protocol 3031A I/O placement was not properly followed, requirements of [e]phinephrine every 3-5 minutes was neglected, there were three failed endotracheal intubation attempts, and no attempts to use alternate airway or manually clear the airway. These treatments were all outside the standard of care and recklessness. … It is my opinion with a reasonable degree of professional certainty that the EMS crew that responded to assist [decedent] acted in a reckless manner and breached the standard of care in addition to the Pennsylvania Statewide BLS Protocol 201 and the Pennsylvania Statewide ALS protocols … by not entering the location with proper diagnostic and treatment equipment and failing to perform an initial assessment before moving [decedent] as directed in 3031A.

The Minute Men proved the report of Howard K. Mell who is a physician[,] board-certified in emergency medicine and emergency medical services. Dr. Mell disagreed with the opinions of Dr[s]. Freeman and McDonald that there was a deviation from the standard of care when the first responders failed to bring in equipment, explaining that the Minute Men were "not dispatched to provide medical service in this case, they were dispatched to help [decedent] up off the floor." Dr. Mell disputed the opinions that moving [d]ecedent to a chair prior to performing an initial assessment was a breach of the standard of care, explaining that Frampton had palpated [d]ecedent's spine and spoke with her before assisting her to the chair. Dr. Mell also disputed the opinions that Frampton violated protocol by attempting an IV prior to attempting an IO; violated protocol by not obtaining an ETCO2 measurement; and, violated protocol by not considering reversible causes of cardiac arrest. Dr. Mell stated that the timing of the epinephrine doses does not represent a breach of the standard of care. He further opined that Frampton did not violate the standard

of care by not considering the use of an advanced airway after failed intubation attempts. As for the conclusion by Dr[s]. Freeman and McDonald that Frampton violated the standard of care and protocols by not contacting medical command, Dr. Mell indicated that because contact with medical command was impossible due to the location, the crew had no choice but to transport [d]ecedent to the hospital. Finally, Dr. Mell disagreed with the opinions of Dr[s]. Freeman and McDonald that lack of documentation was a violation of the standard of care. He offered the following opinion:

> I can confidently state with medical certainty that: 1. The responding Montrose Minute Men (Paramedic Shawn Frampton, EMT Amy Johnson, EMT James Krupinski, and EMT Robert Getz) did not violate the standard of care expected of EMS providers during their treatment of [decedent] on January 15, 2019. The actions or inactions of Montrose Minute Men EMS [p]roviders did not lend, in any way, to the injuries suffered by the [decedent]; and 3. While tragic, the events that occurred were an almost immutable chain of events set into motion by a combination of [decedent's] pre-existing conditions, and her suffering a cardiac arrest geographically distant to an advanced medical center, and were possibly complicated by the fall she suffered immediately prior to her cardiac arrest. The EMS providers on the scene responded admirably to a very difficult situation.

Trial Court Opinion, 12/8/21, at 3-11 (footnotes and record citations omitted) (some alterations in original).

Fry filed the present action on May 12, 2020. Predicated on his contention that the Minute Men's actions were causally or contributorily related to his seventy-one-year-old wife's death, Fry's complaint sought damages against that entity, alleging wrongful death, a survival action, a claim for gross negligence/recklessness, a claim for corporate liability as to negligent hiring, supervision, and retention, and a claim for negligent infliction

of emotional distress. Eventually, after preliminary objections, which, *inter alia*, involved the striking of Fry's negligent hiring and retention claims (but not negligent supervision), Minute Men filed an answer to Fry's complaint on December 15, 2020.

Approximately eight months later, on August 30, 2021, the Minute Men filed a motion for summary judgment, principally asserting that Fry has shown no evidence of gross negligence or willful misconduct, which correspondingly meant, as a matter of law, Fry could not recover damages. The Minute Men also presented ancillary arguments contesting: (1) Fry's claim for punitive damages; (2) Fry's negligent supervision claim; and (3) Fry's negligent infliction of emotional distress claim. Much like the rationale underpinning the Minute Men's chief contention, those additional arguments challenged Fry's ability to prove the elements of each cause of action based on the evidentiary record that had been amassed. The motion followed months of discovery, which specifically involved the taking of depositions and the exchanging of expert reports. Ultimately, after oral argument, the court granted the Minute Men's motion for summary judgment as to all claims contained in Fry's complaint.

Resultantly, Fry filed a timely notice of appeal from the lower court's determination. Thereafter, the relevant parties complied with their respective obligations under Pennsylvania Rule of Appellate Procedure 1925, and as such, this matter is ripe for review.

On appeal, Fry presents seven issues for this Court's review:

1. Did the trial court abuse its discretion or commit an error of law in its interpretation of the standard for granting summary judgment?

2. Did the trial court err in granting summary judgment in favor of the Minute Men on the issue of gross negligence where genuine issues of material fact exist as to whether there was an extreme departure from its standard of care?

3. Did the trial court err in finding that the actions and omissions of Shawn Frampton and Amy Johnson failed to rise to the level of gross negligence where the record is replete with genuine issues of material fact?

4. Did the trial court err in granting immunity under the Emergency Medical Services System Act ([EMSSA]), *see* Act of August 18, 2009, P.L. 308, as amended, 35 Pa.C.S. § 8101 *et seq.*, as genuine issues of material fact exist as to the extreme departure from the standard of care constituting gross negligence from the Minute Men and its agents?

5. Did the trial court err in granting summary judgment as to Fry's punitive damages claim without reviewing the merits when genuine issues of material fact exist as to the gross negligence of the Minute Men, precluding it from immunity under the [EMSSA]?

6. Did the trial court err in granting summary judgment as to Fry's negligent supervision claim without reviewing the merits when genuine issues of material fact exist as to the gross negligence of the Minute Men, thereby precluding it from immunity under the [EMSSA]?

7. Did the trial court err in granting summary judgment as to Fry's negligent infliction of emotional distress claim, as there are genuine issues of material fact as to the Minute Men's gross negligence?

*See* Appellant's Brief, at 12-13.

All of Fry's claims allege that the trial court's grant of summary

judgment was inappropriate. Correspondingly, we note that our standard of review of the trial court's grant of summary judgment is *de novo*, and our scope of review is plenary. *See Pyeritz v. Commonwealth*, 32 A.3d 687, 692 (Pa. 2011); *American Southern Insurance Co. v. Halbert*, 203 A.3d 223, 226 (Pa. Super. 2019). A grant of summary judgment in favor of a defendant is appropriate only where the material facts are undisputed and, additionally, that defendant is entitled to judgment as a matter of law on those undisputed facts or, conversely, where, after discovery, the plaintiff has failed to produce evidence of facts essential to his cause of action against that defendant. *See* Pa.R.C.P. 1035.2; *Kibler v. Blue Knob Recreation, Inc.*, 184 A.3d 974, 978–79 (Pa. Super. 2018); *Criswell v. Atlantic Richfield Co.*, 115 A.3d 906, 909 (Pa. Super. 2015). To determine whether there is a genuine dispute of a material fact that precludes summary judgment or whether the plaintiff has produced sufficient evidence to support a cause of action, we must view the record in the light most favorable to the plaintiff, as the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the defendant movant. *Criswell*, 115 A.3d at 908-09; *Petrina v. Allied Glove Corp.*, 46 A.3d 795, 798 (Pa. Super. 2012). Even though summary judgment cannot be granted against a plaintiff based on the credibility of oral testimony other than the plaintiff's admissions, oral testimony of witnesses other than the plaintiff may be considered in determining whether the plaintiff has produced sufficient evidence of the

- 10 -

essential elements of his cause of action. *See Winwood v. Bregman*, 788 A.2d 983, 985 (Pa. Super. 2001).

The lower court found that the claims in Fry's complaint all sounded in negligence, with those claims being asserted against both the Minute Men, as an entity, and its agents, those who rendered medical services on Fry's wife. Fry, therefore, was required to prove that the Minute Men and/or its agents owed him or his wife a duty of care, that the Minute Men and/or its agents breached that duty, that there was a causal relationship between that breach of duty and his or her injury, and that Fry or his wife suffered actual loss. *See Koziar v. Rayner*, 200 A.3d 513, 518-19 (Pa. Super. 2018); *Collins v. Philadelphia Suburban Development Corp.*, 179 A.3d 69, 73 (Pa. Super. 2018). The determination as to whether a duty exists is a question of law. *See Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 221-22 (Pa. 2018); *Baumbach v. Lafayette College*, 272 A.3d 83, 89 (Pa. Super. 2022).

The court found that Shawn Frampton and Amy Johnson, acting in their capacities as paramedic and EMT, respectively, did not demonstrate gross negligence or willful misconduct on January 15, 2019. As such, they, and by extension the Minute Men, were absolved of any potential liability given the language of the EMSSA. The EMSSA states that "[n]o EMS agency, EMS agency medical director or EMS provider who in good faith attempts to render or facilitate emergency medical care authorized by this chapter shall be liable for civil damages as a result of an act or omission, absent a showing of gross

negligence or willful misconduct." 35 Pa.C.S. § 8151(2). In defining "gross negligence," this Court has interpreted the phrase to be liability that is "premised on facts indicating more egregiously deviant conduct than ordinary carelessness, inadvertence, laxity, or indifference." ***Bloom v. Dubois Regional Medical Center***, 597 A.2d 671, 679 (Pa. Super. 1991). Specifically, "[t]he behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care." ***Id***. While, generally, it is for a jury to decide whether an act or failure to act constitutes gross negligence, such a determination "may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find gross negligence." ***Feleccia v. Lackawanna College***, 215 A.3d 3, 20 n.12 (Pa. 2019) (citation omitted).

> The court summarized Fry's two expert reports:

> Dr[s]. Freeman and McDonald believed that the actions of the Minute Men crew in failing to carry equipment into the Fry home, failing to perform an initial assessment prior to moving [d]ecedent to a chair, failing to follow protocol for IO placement, failing to administer epinephrine every three to five minutes, and failing to use an alternate airway or manually clear the airway after three failed intubation attempts were deviations from the standard of care.

Trial Court Opinion, 12/8/21, at 14 (footnote omitted). However, the court concluded that "[e]ven viewing the evidence in a light most favorable to Fry, [it did] not find that the actions of Frampton and Johnson alleged to be grossly negligent were flagrant, grossly deviating from the standard of care or an extreme departure from ordinary care." ***Id***. The court continued:

- 12 -

The crew's failure to bring in diagnostic equipment when they arrived at the Fry residence hardly rises to an extreme departure from the standard of care or shows a conscious, voluntary omission in reckless disregard of a legal duty. At most, the failure of the crew to bring equipment when they first arrived at the Fry home may – or may not – rise to a level of ordinary negligence. And while it is undisputed that Frampton did not document whether he performed an initial assessment of [d]ecedent prior to moving her to a chair, it is unclear that Frampton failed to perform any assessment of [d]ecedent. As indicated by Dr. Mell, it is highly unusual for an EMS provider to specifically list their assessment. Furthermore, if Frampton had failed to perform an initial evaluation of [d]ecedent, failure to perform this assessment does not rise to the level of gross negligence. Additionally, insertion of an IO after a failed attempt at insertion of an IV and failing to use an alternate airway or manually clear the airway after three failed intubation attempts do not rise to the level required to establish gross negligence on the part of the Minute Men crew. Even if these actions were deviations from the standard of care, they do not demonstrate a significant departure from how a reasonably careful person would act under similar circumstances. Finally, it is undisputed that the epinephrine dosing, as documented, was not in line with [s]tatewide protocols as to timing. Nevertheless, while it is possibly that the epinephrine dosage timing might – or might not – be sufficient to establish ordinary negligence, it does not reach the level of gross negligence. In other words, there is no suggestion that Frampton acted in reckless disregard of the consequences or acted with substantially more than ordinary carelessness, inadvertence, laxity, or indifference when administering the epinephrine to [d]ecedent while also performing CPR.

*Id*., at 15-16 (footnote omitted).

Beyond finding no indicia of gross negligence, the court also determined that Fry failed to present evidence of willful misconduct by the Minute Men or its agents, and in so finding, Fry was therefore prohibited from an alternative basis to surmount the EMSSA's immunity. *See* 35 Pa.C.S. § 8151(2); *see also* Trial Court Opinion, 12/8/21, at 16. The court concluded that the Minute

Men's immunity under the EMSSA foreclosed Fry from punitive damages and prevented any likelihood of recovery as to his negligent infliction of emotional distress claim. *See id*., at 17-18.

All seven of Fry's arguments are premised on challenging the court's immunity finding. Fry contends that he "established [the Minute Men's] gross negligence through thorough and well-supported expert reports." Appellant's Brief, at 44. Specifically, "Dr. McDonald meticulously outlined, in his eleven … page report, how the actions and omissions of the Montrose Minute Men were both reckless, beyond the ordinary standard of care, and in conscious disregard for the care and life of the decedent." *Id*. Fry also states that Dr. Freeman's report establishes materially the same. *See id*., at 45.

Distilled down, Fry argues that his expert reports, by themselves, create inherent issues of fact that are necessary for jury adjudication. However, other than citing two pieces of "authority," one from this Court and another from a trial-court level decision, even accepting everything contained within his expert reports as true, Fry has failed to show that the Minute Men, or its agents, engaged in any kind of behavior that could be considered grossly negligent or willful misconduct.

Fry relies on the aforementioned *Bloom* decision to baldly insinuate that the facts underpinning that case are applicable here. *Bloom*, which was an appeal taken at the pleadings stage of trial and involved a suicide attempt by one of the plaintiffs, resulted in a finding that the complaint pleaded facts

sufficient to possibly allow for a finding of gross negligence. **See** 597 A.2d at 679. In particular, "[t]he complaint alleged that the defendants, who held themselves out as competent to provide psychiatric treatment to one on the position of [one of the plaintiffs], completely failed to diagnose her mental condition and treat her in a manner that would protect her from serious physical harm." **Id**. The complaint "further averred that upon admission the defendants were informed of [one of the plaintiff's] mental disorder and nevertheless failed to take adequate precautions to assure her safety." **Id**. **Bloom** cautioned, though, that "it [was] not certain whether the plaintiffs can develop evidence that will demonstrate that the defendants' failure was flagrant enough to be characterized as a gross deviation from the applicable standard of care." **Id**. While both **Bloom** and the present matter involve circumstances of a medical nature, Fry has not shown **Bloom** to have any direct applicability; the fact of the matter is that there were wholly different conditions present when the Minute Men rendered aid on the decedent and, importantly, **Bloom** features a disposition at the pleadings stage.

Fry's proceeding citation to **Clifford v. Community Medical Center** is equally, if not more, inapposite. **See** 59 Pa. D. & C. 5th 399 (Lacka. Co. 2016). To start, Fry only describes this case in two sentences. From these two sentences, Fry frames that trial court's conclusion, which was responsive to a motion for summary judgment, as holding that "the physicians should have known that abruptly changing patient's medication could have been an

- 15 -

aggravating factor of the suicide itself." Appellant's Brief, at 50. Even accepting Fry's recounting of the court's legal analysis, **Clifford** involved a suicidal decedent that had been evaluated by several medical professionals in a clinical setting.

It is unclear what persuasive value Fry is attempting to extract from this case. Although he attempts to bridge the gap between **Clifford** and the present matter by stating that the Minute Men were "fully aware of the protocols required to administer proper and appropriate emergency services and care to decedent[,]" **id**., as best can be discerned, the court's opinion in **Clifford** did not imply that cognizance of protocols and, by implication, that the failure to administer 'proper and appropriate' emergency services inherently, or as a matter of law, constitutes gross negligence. Moreover, we emphasize that **Clifford** is *not* precedential.

The rest of Fry's brief is dedicated to record citations and conclusory averments attempting to establish that the Minute Men's actions were grossly negligent. In particular, Fry suggests, or reiterates his belief, that the Minute Men's agents did not follow the required protocols, did not perform an initial assessment of the decedent, did not clear the decedent's airway prior to performing CPR, and did not administer epinephrine at the correct interval. **See id**., at 50-52. However, we are constrained by Fry's total lack of support tending to show that liability stemming from any of the Minute Men or its agents' actions have been: (1) found by a jury or appellate court under similar

or analogous circumstances to constitute gross negligence or willful misconduct; or (2) able to conceptually survive a motion for summary judgment. Without evidence of either, even reviewing the record in a light most favorable to Fry, there is no indication that there is a triable issue of material fact that would ultimately allow him to recover on any of the claims asserted in his complaint.

Without any materially significant issues for a jury to resolve and, too, through the court's determination that the Minute Men and its agents were shielded from civil liability as none of their actions constituted gross negligence or willful misconduct, we affirm the lower court's order granting summary judgment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/28/2023